493 So.2d 909 (1986)
POGO PRODUCING CO., Plaintiff-Appellee,
v.
SEA ROBIN PIPELINE CO., Defendant-Appellant.
No. 85-394.
Court of Appeal of Louisiana, Third Circuit.
August 29, 1986.
Writ Denied November 21, 1986.
*910 David R. Richardson, Barham & Churchill, New Orleans, Patrick S. Ottinger, Blauche, Hartley, LaPeyre & Ottinger, Lafayette, Paul G. Van Wagenen, Houston, Tex., for plaintiff-appellee.
Louis R. Davis, Michael R. Mangham and George W. Hardy, III, Broadhurst, Brook, Mangham & Hardy, Lafayette, and H. Bruce Golden, of Mayer, Brown & Platt, B.J. Bradshaw and M.W. Parse, Jr., Fulbright & Jaworski, Houston, Tex., for defendants-appellants.
Before FORET, KNOLL and MOUSER,[*] JJ.
KNOLL, Judge.
This appeal questions the granting of a preliminary injunction in favor of Pogo Producing Company (Pogo) to enforce specific performance against Sea Robin Pipeline Company (Sea Robin) on six gas purchase contracts. The trial court directed Sea Robin: (1) to take and to pay during each year the Annual Minimum Quantity (AMQ) of gas equal to 85% of Pogo's delivery capacity (DC) from six blocks; and (2) to take at least and pay for the Minimum Monthly Quantity (MMQ). Sea Robin appeals, assigning as error that the trial court erred in finding that: (1) Pogo made a prima facie showing of a likelihood of success on the merits; and (2) Pogo established that irreparable injury will occur before trial on the merits. The issue presented is whether the six contracts entered into between Pogo and Sea Robin are enforceable against Sea Robin since its five year stated term has expired. We affirm, finding Section XI.06 of the contracts a valid agreement made in contemplation of deliveries of gas made after expiration of the contracts which entitles Pogo to specific performance caused by Sea Robin's breaches.

*911 FACTS
The six contracts at issue were entered into between Pogo or its predecessor, Pennzoil Offshore Gas Operators, Inc., and Sea Robin, a joint venture of two wholly owned subsidiaries of United Gas Pipeline and Southern Natural Gas Company, covering six blocks with one or more reservoirs in each block, identified as: East Cameron 609; West Cameron 617; East Cameron 334; East Cameron 335; South Marsh Island 128, and Eugene Island 261. All of the gas in five of the blocks is committed to Sea Robin under the contracts; the gas in the East Cameron 335 Block is under a split contract of 50% to United Gas Pipeline and 50% to Sea Robin. All of the contracts were for stated terms of five years from date of first delivery and expired during 1982 through 1984. The contracts provided Sea Robin make up rights for gas paid for but not taken; the make up rights expired as each contract expired. All of the contracts were issued a certificate of public convenience and necessity by the Federal Energy Regulatory Commission (FERC) which is required of all contracts for the sale of natural gas resold in interstate commerce. Phillips Petroleum v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). Once the certificate is issued, the contracting parties are bound to a continuing service obligation imposed by federal statute and regulations (15 U.S.C. § 717f(b)), although the contracts have expired, until the producer receives FERC approval to abandon such service. Sunray Mid-Continent Oil Co. v. Federal Power Com'n, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960).
In 1982, Sea Robin began breaching its take requirements under the "take or pay" provisions of the contracts and continued breaching the take requirements through the expiration of the contracts, which prompted Pogo, after settlement negotiations failed, to file suit for a preliminary and permanent injunction, and for a declaratory judgment. Sea Robin removed the case to federal court on allegations of federal question jurisdiction, but the United States District Court for the Western District of Louisiana remanded the case to the Fifteenth Judicial District Court. Sea Robin filed a motion to dismiss for laches, a motion to strike, and exceptions of prematurity, lack of subject matter jurisdiction, no cause of action and unauthorized use of summary process. The motions and exceptions were denied. Since the trial of the preliminary injunction, Pogo and Sea Robin have settled the AMQ delinquencies for 1982, 1983, and 1984, but Pogo reserved the right in that settlement to recite Sea Robin's history of breaches because of the injunctive relief granted, i.e., specific performance.
Pogo alleged that Sea Robin had failed to either take or pay for the AMQ (85% of DC) both in 1982 and 1983, and that the delinquencies for the two years combined exceeded $33,000,000. Pogo further alleged that in numerous months during 1982, 1983, and 1984, Sea Robin had failed to take the MMQ (55.28% of DC) on one or more contracts, and that Sea Robin's breaches of contract were causing Pogo irreparable injury of two types: (1) injury to its rate-sensitive partial water drive reservoirs by loss of gas to commerce as a result of Sea Robin's low takes; and (2) loss of revenues, resulting in Pogo's inability to carry out its exploration and production programs, which inability would lead in turn to the loss of huge but unquantified amounts of future revenue.
Pogo's petition prayed that Sea Robin be enjoined to take and pay for at least the MMQ for every future contract month and that Sea Robin be enjoined to take and pay for the AMQ by the end of each future contract year. Sea Robin claims the contracts cannot be enforced against it after the five year stated term expired, and at most it is required to take that amount of gas necessary to fulfill its obligation under the Natural Gas Act (NGA) to serve its customers.
Pogo contends that Section XI.06 of the contracts requires Sea Robin to continue performing the same obligations which it had before the stated terms of the contracts *912 expired, but without the pre-expiration rights it had vis-a-vis Pogo, for as long as Pogo is required by applicable law, rule or regulation to keep selling gas to Sea Robin. Section XI.06 of the contracts provide:
"Section XI.06. Deliveries After Termination of Contract.
If Seller shall be required for any reason by any applicable law, rule, regulation or order to continue making deliveries to Buyer of the gas which is the subject matter of this Contract notwithstanding that this Contract shall have been terminated for any reason, whether by its own terms or by Seller or Buyer, it is expressly agreed and recognized by Seller and Buyer that Seller shall have no contractual obligations by reason of this Contract to Buyer in any such event, but Seller shall be entitled to enforce each and every provision of this Contract against Buyer, such provisions being conclusively deemed, in the absence of a showing by Seller of a greater fair value, to be the fair value of the services performed and the subject matter delivered by Seller to Buyer under legal constraint, but without a Contract. The obligation of Buyer under this Section XI.06 is absolute and unconditional and will remain in effect notwithstanding any event or circumstance whatsoever which might otherwise serve as a defense or relieve Buyer of any part of such obligation, save and except that this obligation shall cease at such time as Seller shall become entitled in accordance with all applicable laws, rules, regulations and orders to cease once and for all making deliveries to Buyer of the gas which is the subject matter of this Contract."

PRIMA FACIE SHOWING OF SUCCESS ON THE MERITS
The issuance of a preliminary injunction is provided by LSA-C.C.P. Art. 3601:
"An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law; provided, however, that no court shall have jurisdiction to issue, or cause to be issued, any temporary restraining order, preliminary injunction, or permanent injunction against any state department, board or agency, or any officer, administrator or head thereof, or any officer of the State of Louisiana in any suit involving the expenditure of public funds under any statute or law of this state to compel the expenditure of state funds when the director of such department, board or agency, or the governor shall certify that the expenditure of such funds would have the effect of creating a deficit in the funds of said agency or be in violation of the requirements placed upon the expenditure of such funds by the legislature.
During the pendency of an action for an injunction the court may issue a temporary restraining order, a preliminary injunction, or both, except in cases where prohibited, in accordance with the provisions of this Chapter.
Except as otherwise provided by law, an application for injunctive relief shall be by petition."
It is well established that to obtain a preliminary injunction under C.C.P. Art. 3601, the moving party must show that the injury, loss or damage he will suffer may be irreparable if the injunction does not issue and he must make a prima facie showing that he will prevail on the merits of the case. General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La.1979). After a careful study of the record of this case and the applicable law, we find that Pogo made a prima facie showing that it will prevail on the merits.
Pogo's claim for injunctive relief seeks specific performance of the contracts against Sea Robin, although they have expired, by virtue of Section XI.06. We find Section XI.06, quoted above, a valid agreement *913 between the parties made in anticipation of Pogo making deliveries of gas to Sea Robin after expiration of the contracts. In Section XI.06, Pogo specifically reserved the right to enforce each and every provision of the contracts. It further provides that Sea Robin's obligations under Section XI.06 are "absolute and unconditional and will remain in effect notwithstanding any event or circumstance whatsoever which might otherwise serve as a defense or relieve Buyer of any part of such obligation" until Pogo is no longer required to sell gas to Sea Robin.
Sea Robin contends that Section XI.06 is void and unenforceable for lack of mutuality and cause. It argues that Section XI.06 lacks mutuality because Section XI.06 eliminates Pogo's obligations under the contracts, and it does not impose any new obligations. We reject the theory of lack of mutuality of obligations under Section XI.06 because Section XI.06 obligated Pogo to continue making deliveries of gas to Sea Robin if required by "any applicable law, rule, regulation or order." A reading of Section XI.06 clearly reflects that this provision was a source of protection for Pogo against Sea Robin when the contracts expired and does not eliminate Pogo's obligations to sell gas to Sea Robin.
Since Pogo was obligated under the terms of the contracts incorporated in the certificates of public convenience and necessity to sell gas to Sea Robin after the contracts expired, Section XI.06 has the effect of continuing the "cause" of the contracts.
The free exercise of will best explains cause in our civil law approach to obligations because the free exercise of will reflects the true intent of the parties' desire to agree to binding obligations. In 6 Litvinoff, Louisiana Civil Law Treatise Obligations § 284, at pages 503-506, Professor Litvinoff worthily explains cause as follows:
"The theory of cause asserts the principle of the autonomy of the will. If there is no cause there can be no will and therefore no obligation validly contracted; but the real grounds for the binding force of the conventional obligation is the fact that the parties gave their consent. The doctrine of consideration, instead, through the establishment of a positive requirement besides the parties' consent, seems to limit greatly the autonomy of the will, since, in spite of the presence of consent a promise is not enforceable if there is no consideration. This alone explains why more contracts are enforceable under the regime of cause than under consideration, with the exception of certain gratuitous promises discussed elsewhere.
The special areas where the enforceability of promises encounters great difficulty at common law because of the doctrine of considerationas opposed to the civil law that finds no difficulty at allare the following, as listed by prominent authority.
(1) Unilateral promises to sell, options, and irrevocable offers.

(2) Requirements [sic] contracts where the supplier assumes the obligation of making periodic performances without any consideration being given by the other party, such as the obligation not to buy from another supplier.57
* * * * * *
(6) Those promises where the consideration is the other party's promise to render a performance which he already was under duty to perform.
* * * * * *

In sum, the evolution of the law of contracts can be viewed as a struggle to achieve a notion of promissory liability. In order to serve the necessities of practical life in a better way, the notion ought to be phrased as a very broad principle, such as `Promises should be enforced unless some intelligible and controlling practical reason for not enforcing them is made to appear.' This principle is, no doubt, better served by the theory of cause than by the doctrine of consideration, as is *914 shown by the examples listed above." (All footnotes omitted except 57).

57In some cases the requirement of mutuality has been construed to mean that the buyer's promise to buy must match the seller's promise to sell. At civil law, the enforceability of `unilateral' contractsof the civilian kindeliminates the problem encountered in so many common law decisions. [Citations omitted.]

Sea Robin argues that Section XI.06 eliminates any obligation on Pogo's part to do anything under the contracts, therefore, Sea Robin's cause is eliminated which renders Section XI.06 unenforceable. Having found mutuality of obligations existed under Section XI.06, we disagree that Section XI.06 eliminated any obligations owed by Pogo.
Section XI.06 was applicable only "if seller [Pogo] shall be required for any reason by any applicable law, rule, regulation or order to continue making deliveries to Buyer [Sea Robin] of the gas...." At the time the parties signed the contracts, both were aware of the federally mandated continuing service obligation after termination of the contracts. All of Pogo's gas is committed to Sea Robin; it cannot sell to anyone else. Sea Robin benefited in that it could expect Pogo to make deliveries of gas to Sea Robin pursuant to the contracts as long as Pogo was required to make deliveries of gas under the certificates. Thus, Sea Robin effectively had a guaranteed supply of gas which was Sea Robin's cause for entering into a binding obligation to buy from Pogo. Sea Robin began experiencing a declining gas market in 1982 which continued during the stated terms of the contracts. Sea Robin no longer needed the quantity of gas it contracted to buy from Pogo and is now trying to defeat its contractual obligations with Pogo. On the other hand, in view of the short terms of the contracts (five years), Pogo negotiated for Section XI.06 for its protection to ensure enforcement of the contractual provisions against Sea Robin during the period of continued service mandated by federal law, otherwise, all the terms and conditions of the contracts would be applicable to Pogo while Sea Robin would be completely free to continue to demand and receive gas from Pogo without being bound by any obligations. The record supports that Pogo relied upon Sea Robin's promised performance to Pogo's detriment. Because of Sea Robin's curtailment of Pogo's gas, Pogo's expenditures for discovery, development and exploration decreased from $278,000,000 in 1982 to: $170,000,000 in 1983; $133,000,000 in 1984, and approximately $132,000,000 for 1985. Sea Robin's curtailment thus in turn caused Pogo to pass up substantial revenue production in New Mexico, Mississippi, Wyoming, North Dakota, and Oklahoma. If Pogo is not allowed to enforce the contract provisions as provided by Section XI.06, then it stands to reason that Pogo will continue to suffer loss of substantial revenue production. Therefore, we find that Section XI.06 does not eliminate Sea Robin's cause for entering into contracts with Pogo.
Sea Robin further argues that Pogo is obligated to sell gas to Sea Robin because Pogo has never exercised its statutory right to seek authority from the FERC to abandon the sales to Sea Robin. This argument likewise fails because Section XI.06 is not contingent upon Pogo seeking FERC approval to abandon its sales to Sea Robin.
While we find Section XI.06 enforceable under Louisiana contract law, we also find that the certificates of public convenience and necessity obligating the parties to continuing service supports this finding. A certificate of public convenience and necessity is issued to producers by the FERC and is required of all contracts for the sale of natural gas resold in interstate commerce. The certificates issued to Pogo incorporated the terms and conditions of the contracts and, therefore, govern the sales of gas by Pogo to Sea Robin. Sea Robin argues that since Section 157.41 of the FERC's regulations was struck down in Shell Oil Co. v. Federal Energy Reg. Com'n, 566 F.2d 536 (5th Cir.1978), that the incorporation of the contract terms in the certificates have no bearing. Section 157.41 provides:

*915 "On and after July 30, 1976, all certificates of public convenience and necessity for the sale of natural gas for resale in interstate commerce shall be conditioned as follows:

All persons making jurisdictional sales pursuant to the authority granted by this certificate are hereby given notice that the contractual obligations between the buyer and the seller are incorporated into the certificate obligations, and that the certificate is further conditioned to require that the seller shall observe the standard of a prudent operator to develop and maintain deliverability from reserves dedicated hereunder."
In Shell Oil Co. v. Federal Energy Reg. Com'n, supra, the primary issue before the court questioned the FERC's jurisdiction over producers under FERC Order No. 539-B which regulated producers to act as "prudent operators" in the transportation and sale of natural gas in interstate commerce. The opinion addresses the FERC's jurisdiction rather than contractual obligations incorporated in certificates. The FERC requires that a conformed copy of the contract for the sale of gas be submitted with the application for a certificate. 18 C.F.R. Sec. 157.25. Therefore, we find it significant that the FERC issued Pogo certificates which incorporated the contractual obligations of the parties.
In summary, we find that Section XI.06 continues the cause of the contracts, thereby giving Pogo the right to enforce each and every provision of the contracts after the contracts have expired. Accordingly, Pogo has made a prima facie showing of success on the merits.

TAKE REQUIREMENTS
Under this argument, Sea Robin contends that even if its take or pay obligation survives expiration of the contracts, there is no basis to conclude that the contracts require Sea Robin to take the AMQ.
The take requirements are provided in Article VII.01 of the contracts, as follows:
"QUANTITIES OF GAS TO BE SOLD AND PURCHASED

Section VII.01. Gas Well Gas.

(A) Annual Minimum Quantity Purchase Obligation. Subject to the other provisions hereof, Buyer shall take from Seller under this Contract during each Contract Year and shall pay Seller for, whether taken or not, quantities of Gas Well Gas which are equal at least to the Annual Minimum Quantity for such Contract Year.

* * * * * *

(C) Makeup. Buyer shall have the right during the remaining term of this Contract to make up Gas Well Gas paid for but not taken pursuant to the provisions of paragraph B of this Section VII.01....

(D) Monthly Minimum. Buyer shall take from Seller under this Contract during each calendar month an amount of Gas Well Gas at least equal to five and forty-two hundredths percent (5.42%) of the Annual Minimum Quantity then in effect."

Pogo contends that the AMQ obligation was an alternative obligation when the contracts were signed, but that it was not an alternative obligation by the time suit was filed because: (1) no make up period remained in which Sea Robin could make up gas paid for in advance but not taken; and (2) Sea Robin had forfeited the obligor's right to elect which alternative to perform by failing in 1982 and 1983 to either take or pay for the AMQ.
Sea Robin contends that its obligation to take or pay for the AMQ does not create true alternative obligations as that term is used in Louisiana law; its obligation is to pay for the AMQ, regardless of whether it takes the AMQ.
Alternative obligations are provided in our Civil Code as follows:
"Art. 1808. Alternative obligation

An obligation is alternative when an obligor is bound to render only one of two or more items of performance. *916 Art. 1809. Choice belongs to the obligor

When an obligation is alternative, the choice of the item of performance belongs to the obligor unless it has been expressly or impliedly granted to the obligee.
Art. 1810. Delay in exercising choice
When the party who has the choice does not exercise it after a demand to do so, the other party may choose the item of performance.
Art. 1811. Obligor may not choose part of one item
An obligor may not perform an alternative obligation by rendering as performance a part of one item and a part of another.
Art. 1812. Impossibility or unlawfulness of one item of performance
When the choice belongs to the obligor and one of the items of performance contemplated in the alternative obligation becomes impossible or unlawful, regardless of the fault of the obligor, he must render one of those that remain...."
Whether a take or pay provision constitutes an alternative obligation was discussed by Judge John M. Duhe, Jr. of the United States District Court for the Western District of Louisiana in the case of The Superior Oil Company v. Transco Energy Company, et al., 616 F.Supp. 98 (W.D.La. 1985), wherein he determined that take or pay provisions in the contracts constitute alternative obligations under the Civil Code. This holding was followed by Judge Parker of the United States District Court for the Middle District of Louisiana in Koch Industries, Inc. v. Columbus Gas Transmission Corporation, No. 83-990-A (M.D.La. March 14, 1985).
After a careful study of the applicable Civil Code articles, we likewise conclude that the take or pay provisions in the contracts at issue constitute alternative obligations. Since Sea Robin breached the contracts in 1982 and 1983 by failing to take or pay for the AMQ after demand by Pogo, the choice of performance belonged to Pogo, therefore, Pogo was entitled to enforce Sea Robin to take and pay for the AMQ. C.C. Art. 1809. While we find the take or pay provisions were alternative obligations, since the contracts have expired the take or pay provisions no longer give Sea Robin an option to take or pay because the alternative of performing one of two items is not available since the make up rights expired, therefore, the provision is now a simple take and pay obligation, enforceable against Sea Robin through Section XI.06. Sea Robin does not have an option of only paying for the AMQ; it must take as well. To impose a pay only requirement without a take requirement would lead to the absurd result of paying for nothing. Louisiana contracts are to be interpreted in light of the common intent of the parties and in light of all of the provisions, so that each provision is given the meaning suggested by the contract as a whole. C.C. Arts. 2045 and 2050. The contracts at issue are gas purchase contracts expressed in clear and explicit language, therefore, we do not have to search for the parties' intent. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. C.C. Art. 2046. The law between the parties is the contract. C.C. Art. 1983.
We therefore conclude that Sea Robin is contractually bound to take and pay at the expiration of the contracts until Pogo is no longer required by any applicable law, rule, regulation or order to make deliveries of gas to Sea Robin.

IRREPARABLE INJURY
Irreparable injury occurs when the party injured cannot be compensated adequately in damages, or when the damages cannot be measured by a pecuniary standard. Melancon v. Assumption Parish Police Jury, 231 So.2d 690 (La.App. 1st Cir.1970); South Cent. Bell Tel. v. F. Miller & Sons, 382 So.2d 264 (La.App. 3rd Cir.1980). To obtain a preliminary injunction, the moving party must show that the injury, loss or damage he will suffer may be irreparable if *917 the injunction does not issue. General Motors Acceptance Corp. v. Daniels, supra. The issuance of a preliminary injunction addresses itself to the sound discretion of the trial court and is subject to reversal only if it is shown that such discretion has been abused or improvidently exercised. Concerned Citizens of Rapides Parish v. Hardy, 397 So.2d 1063 (La.App. 3rd Cir. 1981).
Sea Robin urges that Pogo failed to sustain its burden of proving that it would suffer irreparable injury pending trial on the merits. On this issue, we incorporate the trial judge's well considered written reasons wherein he found that Pogo demonstrated that it will suffer irreparable injury if the preliminary injunction is not issued, as follows:
"The Court finds that Pogo has demonstrated that it will suffer irreparable injury, loss or damage if the preliminary injunction prayed for is not issued. The Court received evidence from four (4) expert reservoir engineers who testified as to the probable type of drive mechanism found in the twenty-one (21) reservoirs in question. Pogo's primary expert testified that sixteen (16) reservoirs are partial water drive reservoirs and are therefore susceptible to lost gas. The goal is to produce a partial water drive reservoir as fast as is feasible to draw down the pressure faster than the influx of water can restore the pressure. Mr. Bill Hise further testified that two (2) of the reservoirs are depletion drives and the remaining three (3) are undetermined. Mr. Hise testified that good engineering practice demands that they be treated as partial water drive reservoirs in order to avoid possible damage.
Ryder-Scott, a neutral third party hired by Sea Robin before this litigation, studied two (2) of the blocks in question here. They concluded that seven (7) of the twelve (12) reservoirs in those blocks should not be curtailed even as far as eighty-five (85%) percent in 1985, and eight (8) of twelve (12) should not be curtailed even as far as ninety (90) percent in 1986.
Sea Robin's expert, Mr. Frank Cormier, testified that six (6) reservoirs were at least partial water drive, four (4) others were uncertain, and the remaining were depletion and/or compaction drive. The Court, after carefully considering the evidence on this issue, is convinced that the majority of these reservoirs has at least a partial water drive. As such, the Court finds that the partial or total shutdown of the wells has permanently damaged and will continue to damage the reservoirs since some of the gas can never be recovered. The Court notes that Pogo is locked into these contracts by their exclusivity provisions and by federal regulation, and so cannot sell the gas from these blocks to any other party. Irreparable injury or loss could not be proven if the damage to the reservoirs could be measured according to a pucuniary standard. The Court finds that this cannot be done and bases this conclusion on the convincing testimony of Mr. Hise, Pogo's reservoir engineering expert. Mr. Hise testified that there is no reliable way to calculate the amount of gas lost. The Court must conclude that a determination of the reservoir loss due to a threatened shut-in is impossible to calculate. In light of the above, the Court is forced to conclude that Pogo is without an adequate remedy at law unless the prayed for preliminary injunction is issued."
We have carefully studied the record and find that the trial court's determination of this issue is well supported by the record, therefore, we do not find that the trial court abused its sound discretion.
Sea Robin contends that Pogo failed to establish that any harm which may be occurring is causally connected to Sea Robin's breaches of reduced purchases of gas since there are other producers selling to other pipelines in the six blocks. Under the contracts, all of Pogo's gas in five of the blocks and half in one block are committed *918 to Sea Robin. The record clearly reflects that Pogo suffered damages to its reservoirs by gas lost through Sea Robin's curtailment of delivery rates far below those required by the contracts. Whether purchasers from other producers in the same blocks are causing additional damages to the reservoirs is irrelevant to Sea Robin's obligations to Pogo.
Sea Robin argues that any reservoir damage Pogo may incur is not irreparable since Pogo has an adequate remedy at law under FERC Order 436 to petition the FERC for an abandonment of service to Sea Robin, and thereby Pogo could sell its gas to others. This was refuted by Pogo because: (1) Sea Robin did not offer to support Pogo in applying for abandonment of service; (2) most of Pogo's gas was low cost gas and it is against FERC policy to interrupt the flow of low cost gas; and (3) Order 436 is irrelevant to the contractual obligations between the parties. Shortly before oral argument, Sea Robin further argued that Pogo could apply for expedited abandonment proceedings under FERC revised Order 436, which the FERC issued on October 9, 1985, well after trial. The record is void of any evidence that Pogo would obtain authorization from the FERC to abandon service to Sea Robin and within a reasonable time. By this argument we are called upon to predict what the FERC would do. The matter before us concens whether a preliminary injunction was properly issued based upon Louisiana contracts entered into between the parties, therefore, in our view FERC abandonment proceedings are irrelevant to this case.
Further, we find Sea Robin urging revised Order 436 shortly before oral argument is wanting since it could have moved to dissolve or modify the injunction under LSA-C.C.P. Art. 3607, which provides:
"An interested person may move for the dissolution or modification of a temporary restraining order or preliminary injunction, upon two days' notice to the adverse party, or such shorter notice as the court may prescribe. The court shall proceed to hear and determine the motion as expeditiously as the ends of justice may require.
The court, on its own motion and upon notice to all parties and after hearing, may dissolve or modify a temporary restraining order or preliminary injunction."
Moreover, Sea Robin could have moved to set the permanent injunction for trial on the merits.
Sea Robin further argues that since Pogo waited over two and one-half years in claiming irreparable injury the preliminary injunction should be reversed. Pogo contends that the delay was the result of four factors: (1) the nature of the contracts and Pogo's status as a non-operator; (2) Sea Robin's breach of its accounting obligation; (3) Pogo's desire to exhaust settlement possibilities before resorting to litigation; and (4) the impossibility of proving irreparable injury to rate-sensitive reservoirs without a detailed and exhaustive study by an outside expert.
Sea Robin fulfilled its take or pay obligations through 1981; it was not until 1982 that it began breaching its AMQ obligation, as well as its MMQ obligations.
The contracts provided that Sea Robin furnish Pogo a statement showing the calculations of the AMQ for the contract year and the quantity of gas taken and paid for by Sea Robin sixty days (March 1) after each contract year (December 31); within thirty days (April 1) after delivery of the statement, Sea Robin is obligated to pay Pogo the difference between the value of the AMQ and the amount taken and paid for. Sea Robin neither furnished Pogo with a statement of calculations for the years 1982 and 1983 nor paid for the difference between the value of the AMQ and the gas actually taken and paid for, which necessitated Pogo, who was not the operator of the wells, to calculate the AMQ and the quantity of gas taken.
Pogo completed its calculations for the 1982 contract year in August of 1983, which reflected a deficiency amount due by Sea Robin of $7,366,910.97. Pogo's calculations for the 1983 contract year reflected a *919 deficiency amount due by Sea Robin of $27,689,942. In August of 1983, after Pogo's calculations were completed, settlement discussions between the parties commenced and continued until October 1984, without resolving the dispute. After failing to reach a settlement, Pogo filed suit on November 21, 1984. In contemplation of filing suit if settlement negotiations failed, Pogo employed an outside expert, Bill Hise, to conduct an involved and thorough study of its rate-sensitive reservoirs. These studies contributed to prolonging the filing of suit and further showed that Sea Robin's curtailment of delivery rates would cause Pogo irreparable injury.
Each case should be judged under its particular set of facts and circumstances as to whether the intervening time between commencement of disagreement and filing of suit would adversely affect issuance of a preliminary injunction. Considering the complexities involved and the history of this case from April 1, 1983, until suit was filed on November 21, 1984, we do not find that the intervening time adversely affected Pogo.
Finally, Sea Robin contends that the preliminary injunction was wrongfully issued because Pogo failed to prove that irreparable injury would occur before trial on the merits. An injunction (temporary restraining order, preliminary injunction or both pending trial on the merits) shall issue where irreparable injury, loss or damage may result to the applicant. LSA-C.C.P. Art. 3601. Specific performance may be enforced by the extraordinary remedy of injunction. J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896 (La.1981). Specific performance is provided in LSA-C.C. Art. 1986 as follows:
"Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.
Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court."
An obligation may give the obligee the right to enforce performance the obligor is bound to render. LSA-C.C. Art. 1758. Specific performance is the preferred remedy for a breach of contract. J. Weingarten, Inc. v. Northgate Mall, Inc., supra. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damages caused, no longer in the creditor's interest, or of substantial negative effect upon the interest of third parties. J. Weingarten, Inc. v. Northgate Mall, Inc., supra. Irreparable injury is considered to be a loss sustained by an injured party which cannot be adequately compensated in money damages or when the damages cannot be measured by a pecuniary standard. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981). All that is required for a preliminary injunction is a prima facie showing that the applicant will prevail on the trial of the merits which is less proof for a permanent injunction. Matter of Kenilworth Ins. Co., 428 So.2d 1187 (La.App. 5th Cir. 1983), writ denied, 434 So.2d 1095 (La. 1983).
The record shows that Pogo sufficiently proved that it would suffer irreparable injury if the injunction did not issue. The record also shows that Pogo's damages cannot be measured by a pecuniary standard, therefore, specific performance is the proper relief and in accord with our civilian tradition.
Wherefore, we find that the trial court did not abuse its discretion in determining that irreparable injury would occur if a preliminary injunction did not issue.
For the foregoing reasons, we affirm the judgment of the trial court. All costs of this appeal are assessed to appellant, Sea Robin Pipeline Company.
AFFIRMED.
NOTES
[*] Judge Edward M. Mouser of the Thirty-Third Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.