**SUPERFOS INVESTMENTS LIMITED t/a Superfos Trading, Inc., Plaintiff,**

v.

**FIRSTMISS FERTILIZER, INC., Defendant.**

**Civ. A. No. J91–0568(L).**

United States District Court, S.D. Mississippi, Jackson Division.

March 4, 1993.

John Yeardley Pearson, Jr., Norfolk, VA, Alan Perry, Foreman, Perry, Watkins & Krutz, Jackson, MS, for plaintiff.

William A. McCrary, First Miss. Corp., Jackson, MS, Thomas W. Tardy and Alexander A. Alston, Alston, Rutherford, Tardy Vanslyke, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Superfos Investments Limited, t/a Superfos Trading, Inc., brought this action seeking damages from defendant FirstMiss Fertilizer, Inc. (FirstMiss) for defendant's alleged breach of its obligations under a contract for the sale and purchase of anhydrous ammonia, a liquid fertilizer. The contract, executed between FirstMiss as buyer and Superfos as seller, was for a term commencing April 1, 1988 and ending December 31, 1990, and required FirstMiss to purchase a minimum of 80,000 tons of anhydrous ammonia in each year of the contract. The contract further provided that should FirstMiss fail to purchase the specified minimum annual volume, it was nevertheless obligated to make payment, upon being invoiced for such deficiency by Superfos, as though the required minimum annual volume of product had been delivered.

In its complaint, Superfos alleges that FirstMiss failed to take delivery of the requisite minimum amounts of anhydrous ammonia dictated by the parties' contract in contract years 1989 and 1990, having taken only 62,856 tons of the product in 1989 and 78,588 tons in 1990. Superfos demands payment of $1,478,670 for the 1989 shortfall and $163,438 for the 1990 shortfall, contending that under the terms of the agreement, it is entitled to recover the full contract purchase price for product not taken by FirstMiss in accordance with the minimum annual purchase obligations.

FirstMiss has now moved the court for partial summary judgment asking that the court resolve the following issue: Whether that provision in its contract with Superfos which provides that FirstMiss must pay the full amount of the purchase price of product for deficiencies or shortfalls in its annual "takes" is enforceable, or whether the provision amounts to a damages penalty for FirstMiss' alleged failure to perform. Superfos has responded to the motion and the court has considered the memoranda of authorities, together with attachments, submitted by the parties in ruling on the motion. Following a thorough review of the authorities upon which the parties rely in support of their respective positions, and after careful deliberation, the court concludes that FirstMiss' motion is well taken and should be granted.

■ Superfos argues that the subject contract is a typical "take-or-pay" contract, which is reasonable, just and enforceable according to its terms. According to Superfos, the provision in the contract which requires FirstMiss to pay for product that it does not take in compliance with the annual minimum requirements imposed by the contract is not a penalty provision, but rather is an alternative means by which FirstMiss may perform its obligations under the contract. In other words, according to Superfos, the contract is, like any other take-or-pay contract, an alternative performance contract, in which the alternatives of taking and paying for the requisite annual volume, on the one hand, and on the other hand of paying for product not taken, are merely the buyer's alternative methods of performing its bargain. First-Miss maintains that while the contract may superficially resemble a take-or-pay contract, this resemblance is betrayed by its substance and the "pay" option purported to be provided is a penalty in disguise. Thus, the question presented for resolution on the present motion is whether the contract at issue is a true "alternative performance" contract (giving the buyer the option of taking and paying for product or of paying for product not taken), or whether the contract is, in fact, one which provides for a primary obligation (taking and paying for product) with provision for the payment of liquidated damages or a penalty (paying for product not taken) as a means of encouraging or ensuring the buyer's performance of the primary obligation. If the contract falls in the former category, it is enforceable according to its terms. If not, then it devolves upon the

court to determine whether the "pay" provision can be construed as an enforceable liquidated damages stipulation or whether it is, in fact, a penalty which cannot be enforced under any circumstances.

Regarding alternative performance contracts, Professor Williston has explained:

A contract may give an option to one or both parties either to perform a specified act or to make a payment; and though this form of contract cannot be used as a cover for the enforcement of a penalty, yet if on a true interpretation it appears that it was intended to give a real option, that is, that it was conceived possible that at the time fixed for performance, either alternative might prove the more desirable, the contract will be enforced according to its terms. The fact that a promise is expressed in the alternative, however, may easily be given too much weight. As the question of liquidated damages or penalty is based on equitable principles, it cannot depend on the form of the transaction, but rather on its substance. It follows that a contract expressed in the alternative, when examined in the light of the existing facts may prove to be:

(1) A contract contemplating a single definite performance with a penalty stated as an alternative;

(2) a contract contemplating a single definite performance with a sum named as liquidated damages as an alternative; or

(3) a contract by which either alternative may prove the more advantageous and is as open to the promisor as the other.

5 S. Williston, *A Treatise on the Law of Contracts* § 781, at 706–07 (W.H.E. Jaeger, ed. 3d ed. 1961). *See also Restatement (Second) of Contracts* § 356, Comment c ("although parties may in good faith contract for alternative performances .:. a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable...."). A number of factors lead the court to conclude that the contract at issue in

the case *sub judice* is not a true alternative performance contract.[1]

Courts have recognized, almost without exception, that "take-or-pay" contracts are alternative performance contracts such that the "pay" option in a "take-or-pay" contract is not a penalty provision, and in fact is not a damages provision at all, but rather is one of the buyer's performance alternatives. *See Prenalta Corp. v. Interstate Gas Co.,* 944 F.2d 677, 688–89 (10th Cir.1991) (observing that "take-or-pay" contracts are alternative performance contracts and distinguishing between "pay" alternative and liquidation of damages); *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.,* 813 F.2d 77, 80 n. 4 (5th Cir.1987) (in rejecting argument that promise to make deficiency payments was unenforceable as a penalty or liquidated damages, court observed that "[t]he take or pay clause is a promise in the Agreement, not a measure of damages after breach; therefore it is not unenforceable as a penalty ... or unreasonable unliquidated damages provision"); *PGC Pipeline v. Louisiana Intrastate Gas,* 791 F.2d 338 (5th Cir. 1986) (take-or-pay contract is considered an alternative obligation under Article 1808 of the Louisiana Civil Code, which provides that "[a]n obligation is alternative when an obligator is bound to render only one of two or more items of performance."); *International Minerals & Chem. Corp. v. Llano, Inc.,* 770 F.2d 879 (10th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986) (with a "take or pay" contract, buyer can perform in either one of two ways: "It can either (1) take the minimum purchase obligation of natural gas (and pay) or (2) pay the minimum bill."); *Sabine Corp. v. ONG Western, Inc.,* 725 F.Supp. 1157, 1184 (W.D.Okla.1989) (" '[t]he take or pay provision ... specifies a contractual obligation rather than dictates damages upon breach.' ... Accordingly, the take-or-pay provision, or more particularly the payment provision, cannot constitute a penalty for failure to perform a liquidated damages provision specifying damages for breach of the 'take' obli-

---

1. The parties' agreement provides that it will be governed by Virginia law and this court, in an earlier opinion, ruled that Virginia law applies to the case. There are no Virginia cases addressing the issue here presented and the court therefore looks elsewhere for guidance.

gation.") (quoting *Universal Resources*); *Kennedy & Mitchell, Inc. v. Internorth, Inc.*, No. 86–C–404–C, 1988 U.S.Dist. LEXIS 17106, at *46 (W.D.Okla. Sept. 20, 1988) (take-or-pay clause provided two alternative performances under the contract; thus, "pay" option was not damages provision but inherent obligation of buyer); *Benson Mineral Group, Inc. v. Northern Natural Gas Co.*, No. 86–1903, 1988 WL 404348 at *6, 1988 U.S.Dist. LEXIS 17581, at *22 (D.Kan. April 28, 1988) (take-or-pay clause provided two alternative methods of performance and thus was neither a liquidated damages nor a penalty provision); *Resources Inv. Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1041 (D.Colo. 1987) (take-or-pay clause was promise within the agreement and not a measure of damages after breach); *Superior Oil Co. v. Transco Energy Co.*, 616 F.Supp. 98, 107 (W.D.La. 1985) (action to enforce buyer's obligation to "pay" for natural gas not taken was construed as action to enforce one item of performance of an alternative obligation); *Hanover Petroleum Corp. v. Tenneco, Inc.*, 521 So.2d 1234, 1241 (La.Ct.App.), *cert. denied*, 526 So.2d 800 (La.1988) ("take-or-pay obligation assumed by [buyer] is not an unlawful stipulated damage clause but an alternative obligation."); *Pogo Producing Co. v. Sea Robin Pipeline Co.*, 493 So.2d 909, 915–16 (La.Ct.App.), *cert. denied*, 497 So.2d 310 (La. 1986) (take-or-pay provisions in the contracts constituted alternative obligations); *Lone Star Gas Co. v. McCarthy*, 605 S.W.2d 653 (Tex.Civ.App.1980). The contract at issue in the case at bar, however, is not a typical take-or-pay contract.

Take-or-pay contracts, which are common in the natural gas industry, are viewed as risk-allocation contracts:

> The purpose of the take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production. To compensate the seller for that risk, buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand. The take-or-pay clause insures that if the demand for gas goes down, seller will still receive the price for the Contract Quantity delivered each year.

*Universal Resources*, 813 F.2d at 80. *See also Prenalta*, 944 F.2d at 688; *Day v. Tenneco, Inc.*, 696 F.Supp. 233, 234 (S.D.Miss. 1988); *Resources Inv. Corp.*, 669 F.Supp. at 1040–41; *Hanover Petroleum*, 521 So.2d at 1239. And they are enforced primarily on the basis that what the buyer is actually paying for is not so much a "product"—gas—as the process by which the gas is made available. The payment is intended to compensate the producer for the costs associated with production and to ensure a steady source of income so that he may continue production. *See Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 570 (10th Cir.1989) (quoting *ANR Pipeline Co. v. Wagner & Brown*, 44 FERC para. 61,057, 61,158 (1988)) ("In the context of the gas purchase and industry practice, the take-or-pay payment is not intended to be a payment for gas and is not a part of the price of gas until it is applied at the time of sale."); *see also Prenalta*, 944 F.2d at 689 (the "pay" alternative ... are not payments for the sale of gas); *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1164 (5th Cir.1988).

Superfos argues that the very reason for its entering into this contract with FirstMiss was to ensure a source of payment with which Superfos could meet its own "take-or-pay" obligations under a separate contract into which Superfos had entered with Farmland Industries, Inc., a producer of anhydrous ammonia. In terms nearly identical to the Superfos/FirstMiss contract (with the exception of the minimum tonnage requirements), the Farmland/Superfos contract required Superfos to take and pay for a minimum annual amount of product or to pay for product not taken in accordance with the required minimum annual quantities. Superfos contends that just as with any other take-or-pay contract, under the terms of their agreement, FirstMiss acquired a contractually assured supply of anhydrous ammonia, while Superfos was assured of a source of payment for Farmland's product so that Farmland could continue to produce, even in the event of a change in the marketplace. FirstMiss accepted the risk of changing market conditions, while Superfos accepted the supply risks associated with Farmland's production since, according to Superfos, it guar-

anteed FirstMiss a constant supply of anhydrous ammonia "even if Farmland failed to meet its obligations to Superfos." Were that the case, then perhaps the question here would be close. However, while a seller's assumption of the risks associated with production is a fundamental feature of take-or-pay contracts, the parties' agreement in this case belies Superfos' contention that it assumed a production risk. In the following terms, the agreement explicitly relieved Superfos of the risk of Farmland's failure to supply the product:

Neither party will be liable for failure to perform or for delay in performing this Agreement where such failure or delay is occasioned by ... "Events of Force Majeure". The parties hereto contemplate that Seller will receive the Product which it needs in order to fulfill its obligations hereunder from Farmland, pursuant to the agreement between Seller and Farmland.... Therefore, *failure of Farmland to deliver a supply of product to Seller pursuant to said agreement, to the extent not excused by acts or omissions of Seller, shall be an Event of Force Majeure that can be exercised by Seller.*

Superfos did not, therefore, bear the risk of production; the contract itself eliminated that risk from Superfos' perspective.

Another factor which confirms usual take-or-pay contracts as alternative performance contracts is a buyer's contractual right to "make-up" for gas paid for but not taken. *See Prenalta,* 944 F.2d at 687 (contract granted buyer credit for gas paid for but not taken and permitted buyer to recoup the make-up gas over the term of the contract); *Universal Resources,* 813 F.2d at 80 (contract provided that buyer could make up gas paid for but not taken during succeeding contract years); *Diamond Shamrock,* 853 F.2d at 1164 (pipeline had right to credit excess gas taken against previous take-or-pay payment); *Day,* 696 F.Supp. at 234 (take-or-pay clauses generally grant pipelines a period of five years to take gas paid for under the clause); *Kennedy & Mitchell,* 1988 U.S.Dist. LEXIS 17106, at *46 (under contracts at issue, buyer had right to recoup gas paid for but not then taken); *Benson Miner-*

*al Group,* 1988 WL 404348, at *2, 1988 U.S.Dist. LEXIS 17581, at *4 (contract provided buyer right during contract term to make up gas paid for but not taken); *Resources Inv. Corp.,* 669 F.Supp. at 1039 (contract provided for gas paid for but not used to be carried forward to subsequent years); *Pogo Producing,* 493 So.2d at 911 (contracts provided buyer make-up rights for gas paid for but not taken); *Koch Indus., Inc. v. Columbia Gas Transmission Corp.,* No. 83–990–A (M.D.La. March 14, 1985) (contract provided buyer a right under take-or-pay contract to make up gas); *Sid Richardson Carbon & Gasoline v. Internorth, Inc.,* 595 F.Supp. 497, 500 (N.D.Tex.1984) ("contractual make-up procedures permit the taking of gas volumes in excess of the minimum quantity required by contract...."); *Hanover,* 521 So.2d at 1236 (under contract, where gas is paid for but not taken, buyer had right to make up such volumes during the term of the contract by taking volumes of gas at a later date above the minimum contract volume without charge); *Lone Star,* 605 S.W.2d at 654 (buyer had right to "make up" or take gas it had paid for, but which it had not taken).

In rejecting a buyer's contention that the take-or-pay provision was an unreasonable penalty provision, the court in *Koch* relied in large measure on the fact that the contract provided the buyer an opportunity, during the term of the contract, to recoup gas for which it had paid but not taken:

[T]he take-or-pay requirements constitute two primary obligations—alternative obligations under Civil Code articles 1808–1812—and are not in the nature of a primary obligation of taking and paying and a secondary or accessory obligation of paying if no gas is taken. Under the contracts, Columbia has the choice to take a specified quantity of gas yearly or to pay for those quantities if they are not taken. The yearly deficiency between the amounts taken and the amounts not taken (the take or pay quantity) are owed by Koch to Columbia. *The contract, however, provides for a five-year make-up period during which Columbia can recoup its take-or-pay deficiencies. Thus, Columbia has a real choice between the two obligations and the second alternative, that of paying*

*for gas not taken, is a prepayment resulting in a later credit, rather than a penalty.*

Comment (d) to Article 1808 of the Civil Code states:

> ... In the penal clause, the obligor has no real "choice" as such; he cannot simply elect to pay the penalty rather perform (sic) the primary obligation. (emphasis added).

The court in *Kennedy & Mitchell, Inc. v. Internorth, Inc.,* No. 86–C–404–C, U.S.Dist. LEXIS 17106 (N.D.Okla. Sept. 20, 1988), similarly rejected a buyer's argument that the take-or-pay provisions of its contract were unenforceable as penalty clauses, likewise emphasizing the significance of a buyer's right to make up or recoup gas paid for but not taken.

> Northern's obligations under the contract are in the alternative. It must take or [pay] (sic). *Northern is thus given two distinct methods for discharging its promise to KMI; in reality, two ways to perform.* Payment is thus not a liquidated remedy in the face of breach, but, indeed, an inherent obligation of Defendant under the contract, which, if ignored, itself constitutes a breach. Payment cannot then be termed "liquidated damages". Such construction would defeat the essential character of a "take-or-pay" clause.

As the court in *Koch* ... observed:

> Thus Columbia had a real choice between the two obligations and the second alternative, that of paying for gas not taken, is a prepayment resulting in a later credit, rather than a penalty.

Such is the case here[.] Under the terms of the instant contracts, Northern has the right to recoup gas paid for but not taken.

*Kennedy & Mitchell,* U.S.Dist. LEXIS, at *46. Thus, a determinative factor in the analysis of provisions of a contract to ascertain whether those provisions truly do provide "alternative obligations" is whether the buyer is given a "real choice" of alternatives. As the *Koch* court indicated, the inclusion of a make-up provision in a take-or-pay contract does just that; it gives the buyer that choice. Conversely, it has been suggested that the absence of such a provision would provide the buyer no real choice.

In *Pogo Producing,* the court addressed the issue of whether specific performance was a proper remedy in a case involving a take-or-pay contract. The court held that "[w]hile ... the take-or-pay provisions *were* alternative obligations, since the contracts (including the buyer's make-up rights) ha[d] expired the take or pay provisions no longer [gave] [the buyer] an option to take or pay because the alternative of performing one of two items [was] not available since the make up rights expired...." *Pogo Producing,* 493 So.2d at 916 (parenthetical added). Since, in the court's view, "[t]o impose a pay only requirement without a take requirement would lead to the absurd result of paying for nothing," *id.,* once the buyer's make-up rights expired, the contract was no longer an alternative performance contract, but rather provided "a simple take and pay obligation," which was enforceable by specific performance. *Id.* at 916. In other words, since no make-up period remained in which the buyer could make up gas paid for in advance but not taken, the "pay" option was no longer a "real" option.[2]

The principal question which has arisen in this case is whether the contract provided

2. Other courts have held that the fact that events occurring after execution of a contract which cause a buyer to be unable to make up gas for which payment had been made, or a buyer's failure to exercise its right to make up product during the term of the contract, does not change the essential nature of the take-or-pay contract as an alternative performance contract; that is, subsequent events do not transform the "pay" alternative into a penalty or damages provision simply because subsequent events remove one of the alternatives (i.e., taking and paying). *See Hanover Petroleum,* 521 So.2d at 1241; *see also Universal Resources,* 813 F.2d at 79–80 (defendant, an experienced buyer, knew of the risk that it might not be able to recoup deficiency payments by taking make-up product); *Lone Star Gas,* 605 S.W.2d at 655–66 (buyer takes risk that it might not be able to make up deficiency within makeup period and, if product is not made up, the buyer could effectively purchase the product a second time). None of these cases, however, considered the question of whether a contract which contains no make-up provision is a true alternative performance contract.

FirstMiss a "real choice" of performance alternatives—that is, whether the "pay" alternative was or could be construed under any circumstances to be equally as advantageous as the take-and-pay option, for absent a "real choice," the contract cannot legitimately be treated and enforced as a valid alternative performance agreement. Determining the answer to this question involves construction of the contract; FirstMiss relies heavily on the absence of a make-up provision for its position that this was not a true alternative performance contract, whereas Superfos insists that the contract did, in fact, give First-Miss a right to make up for "takes" below the minimum annual quantities. While the contract at issue does provide that FirstMiss may make up deficiencies in its quarterly takes, contrary to Superfos' position, nothing in the parties' contract grants FirstMiss the right to make up any annual shortfalls. Viewing the contract in its entirety, it is manifest that FirstMiss' primary obligation under the contract is to "take" a minimum *annual* volume of product.

Paragraph 1 of the contract establishes the parties' primary obligations:

> *Quantity.* Seller shall sell, transfer, convey, and deliver to Buyer, and Buyer shall purchase and accept from Seller, not less than Eighty Thousand (80,000) and not more than One Hundred Twenty Thousand (120,000) tons of anhydrous ammonia pursuant to this Agreement during each Contract Year. Contract Year shall mean each calendar year that this agreement is in effect.... In the event Buyer does not purchase the required minimum annual volume of 80,000 tons ... pursuant to this Agreement, Seller shall invoice Buyer for such volume required to be purchased hereunder as if the product had been purchased on December 31 of the then current Contract Year. Buyer shall pay such invoiced amount within ten (10) days of receipt of invoice. Failure of the parties to extend this Agreement shall not excuse Buyer from its obligations to pay for minimum annual volumes hereunder.

Paragraph 2 of the contract sets forth the manner of performance of the parties' primary obligations:

> *Minimum Quarterly Amount. In performing their obligations pursuant to paragraph 1,* Seller shall sell, transfer, convey and deliver to Buyer, and Buyer shall purchase and accept from Seller, not less than 15,000 nor more than 35,000 tons of anhydrous ammonia during each calendar quarter, commencing April 1, 1988. Seller shall not be required to sell more than 12,000 tons in any one calendar month. During the term of this Agreement, Seller shall make available for delivery each quarter the amount of anhydrous ammonia forecasted by Buyer. In the event Buyer does not take receipt of any amount made available in accordance with Buyer's forecast, Seller shall have the right to invoice Buyer for, and Buyer shall pay, the full purchase price for that quantity computed in accordance with the provisions of this Agreement. *Any payment made pursuant to the preceding sentence for a quantity of product forecasted for purchase by Buyer in a quarter but not accepted shall be treated as a prepayment against subsequent delivery of an equal quantity of Product during the same Contract Year.* Buyer's failure to forecast purchases does not relieve it of its annual purchase obligations set forth in paragraph 1. Buyer shall not be relieved of its annual purchase obligation, as set forth in paragraph 1, due to its inability to attain such minimum obligations because of the maximum quarterly or monthly delivery quantities. (emphasis supplied).

Superfos contends that in accordance with these provisions, if FirstMiss experienced deficiencies or shortfalls during any quarter, it had the right to "make up" such deficiencies by receiving additional delivery of product during the remainder of the contract *term.* The contract unambiguously provides, however, that this right to make up quarterly shortfalls did not extend throughout the term of the contract, but rather applied only to deliveries of product "during the same Contract Year." Whereas paragraph 2, relating to the parties' *quarterly* (as opposed to annual) obligations, granted FirstMiss a right to make up product by providing that a payment for a quarterly deficiency would operate as a prepayment against subsequent de-

liveries during the same contract year,[3] a comparable provision is noticeably absent from paragraph one, which addresses First-Miss' minimum *annual* purchase obligations. Furthermore, it is clear that this lawsuit is about FirstMiss' failure to order 80,000 tons of product per year, i.e., its failure to meet its minimum *annual* purchase obligations,[4] and the issue, therefore, is whether the contract provided for make-up product beyond the contract year.[5] Clearly, it did not.[6] Thus, FirstMiss had no real alternative under the contract.

The court is, of course, cognizant that a contract which provides for the payment of a liquidated sum of money as one of the alter-native methods of performance can be a valid alternative performance contract. *See Prenalta,* 944 F.2d at 689 (citing 5 A. Corbin, *Corbin on Contracts* § 1082, at 463–64 (1964)). But where it cannot reasonably be concluded that at the time the contract was entered, paying for a product not taken might prove as desirable as taking the product and paying for it, then it cannot be reasonably concluded that the "pay" alternative is a true alternative. In the court's opinion, the "pay" option in this contract was not a "real option."

In an analogous case, *USX Corporation v. International Minerals & Chemicals Corp.,* No. 86 C 2254, 1987 WL 20427, 1977

3. Arguably, this prepayment feature does not establish in FirstMiss a *right* to make up product even within the contract year, since it is entirely at Superfos' option.

4. Indeed, respecting the parties' *quarterly* (as opposed to annual) obligations, the contract required FirstMiss to purchase and accept and required Superfos to sell "not less than 15,000 ... tons of anhydrous ammonia during each calendar quarter....," such that FirstMiss' compliance solely with the minimum *quarterly* volumes would have required that it purchase 60,000 tons of product per contract year. According to Superfos' allegations, FirstMiss purchased 62,856 tons of product in 1989 and 78,588 tons in 1990.

5. Superfos argues that the provision in paragraph 1 that "failure of the parties to extend this Agreement shall not excuse buyer from its obligations to pay for minimum annual volumes hereunder" shows the parties' intention and understanding that FirstMiss' ability to make up tonnage not taken did not expire until the end of the contract term. In support of this position, Superfos points out that this construction of the agreement is consistent with the interpretation of Farmland and Superfos concerning virtually identical provisions in the Farmland Agreement. More specifically, Superfos has presented copies of correspondence between Superfos and Farmland in which those parties undertook to "confirm [their] interpretation" and "clarify [their] understanding" that the provisions of both paragraphs 1 and 2 of their agreement were "designed to be a prepay for product to be delivered in the following months and not as a penalty to the Buyer...." The correspondence stressed that "this provision was not included in the contract to penalize the Buyer."

Two observations are in order regarding Superfos' position on this point. First, it is the court's opinion that the passage in its contract with FirstMiss upon which Superfos relies in support of its position does not imply that First-Miss had a make-up right which extended beyond the end of any contract year. Rather, by its terms, that passage provides only that FirstMiss' obligation to pay does not terminate if the contract is not extended. Secondly, while Superfos and Farmland may have agreed that provisions in their contract had a certain meaning (which they apparently recognized was not evident from the terms of their agreement), there has been no evidence presented to indicate that FirstMiss was given the benefit of such a construction of its contract with Superfos. Indeed, there is nothing to indicate that FirstMiss was aware that the Farmland/Superfos contract was being so interpreted by the parties to that agreement. Finally, it could certainly reasonably be inferred from the Superfos/Farmland correspondence that those parties recognized that in the absence of a provision for make-up product beyond the contract year, the requirement that the buyer pay for product which it had not ordered during the contract year constituted a penalty.

6. Superfos appears to recognize that contract construction is a matter for the court, in the absence of ambiguity, see *Revel v. American Export Lines, Inc.,* 162 F.Supp. 279, 287 (E.D.Va. 1958), *aff'd,* 266 F.2d 82 (4th Cir.1959), and that the court's function is to ascertain the intention of the parties from the language of the parties' contract, as well as the circumstances surrounding the contract at the time of its creation and during its performance. *See Meade v. Wallen,* 226 Va. 465, 467, 311 S.E.2d 103 (1984); *Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 8–10 (4th Cir.1971); *Envirotech Corp. v. Halco Engineering,* 234 Va. 583, 364 S.E.2d 215 (1988); *Taylor v. Sanders,* 233 Va. 73, 353 S.E.2d 745 (1987). But while Superfos argues that "[a]n adequate record does not exist upon which to grant summary judgment" since "[t]hose circumstances are not yet in evidence," Superfos has not identified or come forward with any evidence of any circumstances which might shed a different light on this agreement.

U.S.Dist. LEXIS 10914 (N.D.Ill. November 11, 1987), the court concluded that a contract which required the buyer to purchase a minimum quarterly quantity of anhydrous ammonia and, for any quarter in which the minimum quantity was not taken to pay for the shortfall "the sum of the Energy Cost per Ton for such quarter," plus five dollars per ton, was not a true alternative performance contract since the seller was relieved of any duty to perform if the buyer were to elect the alternative of paying but not taking any product.[7] In its opinion, the court distinguished the contract at issue from "a take-or-pay natural gas contract [which] assumes most expenses are incurred before gas is produced [such that] the supplier should expect full compensation since it incurred all its expenses," and further observed that whereas take-or-pay contracts "commonly provide for a later delivery of displacement of 'make-up gas' to offset the payment[,] [n]o comparable provision [was] provided" in the contract it was considering. *USX*, slip op. 1987 WL 20427 at *8 n. 7, 1977 U.S.Dist. LEXIS 10914 at *18 n. 7. The same factors distinguish the contract in the case at bar from true take-or-pay (alternative performance) contracts.

◼ The court, having concluded that the contract is not a true alternative performance contract despite its superficial appearance as such, must now determine whether the "pay" alternative may be construed as a valid liquidated damages provision, or whether it is, instead, a penalty which may not be enforced against FirstMiss. The question whether the contract establishes a penalty is one of law to be resolved by the court. *Ruckelshaus v. Broward County School Board*, 494 F.2d 1164, 1165 (5th Cir.1974). Virginia law recognizes that the parties to a contract may liquidate damages if they do so in an "amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." Va. Code. § 8.2–718. However, "[a] term fixing unreasonably large liquidated damages is void as a penalty." *Id. See also Taylor v.*

*Sanders*, 233 Va. 73, 353 S.E.2d 745, 747 (1987) ("where the stipulated amount would be grossly in excess of actual damages, courts of law usually construe such a stipulation as an unenforceable penalty."). Professor Williston has said:

> Though difficulties frequently arise in the application of the principle distinguishing [a provision for liquidated damages from a provision for a penalty], the fundamental basis of the distinction at least is evident: A penalty is a sum named, which is disproportionate to the damage which could have been anticipated from breach of the contract, and which is agreed upon to enforce performance of the main purpose of the contract by the compulsion of this very disproportion. It is held *in terrorem* over the promisor to deter him from breaking his promise. Liquidated damage, on the other hand, is a sum fixed as an estimate made by the parties at the time when the contract is entered into, of the extent of the injury which a breach of the contract will cause.

*Williston* § 776. In the case at bar, FirstMiss maintains that at the time the parties entered into the contract, they should have anticipated that upon breach by FirstMiss, at worst, Superfos would have been required to resell the product at a reduced price, if Farmland would not release Superfos from its own purchase obligations, and that Superfos' anticipated losses would have been no greater than the difference between the contract price and the market price at the time of resale, plus costs incident to the resale less any amounts saved as a result of not having to deliver the product to FirstMiss. According to FirstMiss, requiring it to pay the full contract price for any shortfall in tonnage is grossly disproportionate to the losses which could have been anticipated or which were actually suffered by Superfos. Superfos counters that at the time of contracting, the parties should have anticipated that Superfos might find itself in a situation where it was obligated to pay Farmland for product not taken by FirstMiss and, since Superfos could not store the product and neither party knew

---

7. The court went on to conclude that the "pay" provision was not a legitimate liquidated dam-

ages provision, but rather provided a penalty which was unenforceable.

what the market conditions would be or whether Superfos would be able to sell the product on the spot market, the only damages which were reasonably ascertainable at the time of contracting were based on Superfos' obligation to Farmland and that provided a reasonable basis for estimating potential damages in the event of breach. The court cannot accept Superfos' position. It simply does not follow from the fact that predicting market conditions is difficult or impossible that it is reasonable to assume that there will be *no* market for the product. For the parties here to have anticipated that Superfos would be damaged to the extent of the *full contract price* for any shortfall, they would have had to have anticipated that the market for anhydrous ammonia would disappear entirely. The court hardly considers that this could have been a reasonable assumption of the parties' contract. And in the court's view, to require FirstMiss to pay the full price for any shortfall in tonnage would, indeed, be grossly disproportionate to any actual or anticipated losses. As such, the provision must be viewed as an unenforceable penalty.[8]

Based on the foregoing, it is ordered that the motion of FirstMiss for partial summary judgment is granted.

---

**8.** Of course, this does not mean that Superfos is precluded from recovering damages for any breach; it merely means that Superfos' damages would be calculated based on the ordinary rules of contract law.