**GLIDDEN COMPANY, Libelant-Appellant,**

v.

**HELLENIC LINES, LIMITED, Respondent-Appellee.**

**No. 113, Docket 25812.**

United States Court of Appeals
Second Circuit.

Argued Jan. 6, 1960.

Decided Feb. 26, 1960.

254

Daniel L. Stonebridge, New York City (Wilbur E. Dow, Jr. and Dow & Stonebridge, New York City, on the brief), for libelant-appellant.

Wharton Poor, New York City (R. Glenn Bauer and Haight, Gardner, Poor & Havens, New York City, on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

The Glidden Company appeals from a judgment dismissing its libel in admiralty to recover damages for the alleged breach of four charter parties between it and Hellenic Lines, Limited. The suit, brought about by Hellenic's admitted failure to perform the contracts because of the closing of the Suez Canal on November 2, 1956 in the Israeli-Egyptian war, presents an interesting problem in the law of frustration of

contracts, as well as certain ancillary problems of contract and agency law.

The libel alleged that Glidden and Hellenic had entered into four charter parties, the first on September 7, 1956 and the other three about November 1, 1956, in which Hellenic undertook to carry four cargoes of ilmenite, an order containing iron oxide and titanium dioxide, used by Glidden in the manufacture of compounds from which paint and other products are made, from Koilthottam, India, to a United States Atlantic port north of Cape Hatteras. The first charter party called for the carriage of 9,000 to 10,000 long tons at a rate of $16 per ton with the vessel, the Hellenic Sailor, to be tendered at Koilthottam not later than November 30, 1956. Under the other three charter parties a total of approximately 25,000 tons of ilmenite was to be carried at a price of $18.50 per ton with the ships to be tendered in December 1956 and January and February 1957. As a result of Hellenic's failure to perform any of the contracts Glidden was required to hire other vessels with a lesser capacity and to curtail its manufacturing operations, for which it sought damages of $540,000.

In its answer Hellenic asserted that as to all four agreements the parties' intention was that the ships would travel from Koilthottam to the United States via the Suez Canal, that the closing of the Canal from November 2, 1956 to about April 10, 1957 prevented use of this route and that the contracts were thereby frustrated and performance excused. Alternatively Hellenic maintained that the closing of the Canal by Egypt exonerated it under a *force majeure* clause of the charter parties, excepting "restraint of princes and rulers" and "other dangers and accidents of the seas"

or under § 4 of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304, incorporated by reference in the charter parties, absolving the carrier of responsibility for loss resulting from an "act of war" or "any other cause arising without the actual fault * * * of the carrier." Two additional defenses, applicable only to the three contracts of November 1, 1956, will be referred to hereafter.

After a trial, Judge Knox, relying upon the recent English decision in Carapanayoti & Co. v. E. T. Green, Ltd., [1958], 2 Lloyd's List L.R. 169,[1] concluded that the agreements were frustrated by the closing of the Suez Canal and dismissed the libel. In our view, however, the charter parties were not frustrated, since alternative routes, specifically referred to in the agreements, were available to Hellenic's ships. We therefore reverse the judgment and remand the case to the district court for a determination of Glidden's damages.

■ The doctrine of frustration of contracts provides, generally, that where the existence of a specific thing is, either by the terms of the contract or in the contemplation of the parties, necessary for performance of a promise in the contract, the duty to perform the promise is discharged if the thing is no longer in existence at the time for performance. Restatement of Contracts § 460. Whether the doctrine is applicable to excuse performance by Hellenic turns upon the interpretation of a clause appearing in each of the four charter parties. The clause states that each charter shall be "for a voyage from *Koilthottam, India,* via Suez Canal or Cape of Good Hope, or Panama Canal, at Owner's option declarable not later than on signing of Bills of Lading, to one safe U. S. Atlantic Port North of Cape Hatteras, port

1. This case was subsequently distinguished by Mr. Justice Diplock in Tsakiroglou & Co. v. Noblee & Thorl, G. M. B. H., [1958] 2 Lloyd's List L.R. 515, and disapproved by Mr. Justice Ashworth in Albert D. Gaon & Co. v. Societe Interprofessionelle Des Oleagineux Fluides Alimentaires, [1959] 2 All E.R. 693. These cases did not relate to charter parties but to CIF contracts; in none was a route specified; they dealt with shipments from Port Sudan to Belfast, Hamburg and Marseilles, respectively, so that the closing of the Suez Canal more than doubled the mileage; and the decision in Tsakiroglou was affected by a finding of the board of appeal of a trade association.

at Charterer's option, *to be declared not later than on Vessel's passing Gibraltar.* The words in italics appear as typewritten insertions in the original printed contracts.

Hellenic argues that it was the intention and expectation of the parties that the voyages would be via Suez, which it asserts is the only economically feasible route,[2] and that the option to sail via the Cape of Good Hope or the Panama Canal was solely for its benefit, but imposed upon it no obligation to choose either of these alternative routes if Suez were closed. In support of this reading Hellenic states that the typewritten insertion—"to be declared not later than the Vessel's passing Gibraltar"—can only have reference to a ship proceeding via Suez and that if the typewritten and printed provisions of the contracts are in conflict, the typewritten insertion, reflecting the later intention of the parties, must control. Glidden disagrees with this reading. It says that the essential nature of the obligation undertaken by Hellenic was to convey Glidden's cargoes from Koilthottam to the United States and that although the shipowner might elect whichever route he chose, the unavailability of one of the three options was not grounds for refusing to perform. Glidden supports its view by calling attention to undisputed evidence introduced at trial that Hellenic, at the time of negotiation of the first of the charter parties, urged Glidden to accept a provision specifically excusing performance by the shipowner in the event that eastward transit of the Suez became impossible and that Glidden had refused the inclusion of such a provision.

■ We find the words of the charter parties taken by themselves to be susceptible to either interpretation. No doubt the parties anticipated that the vessels would be likely to travel the customary route via Suez and inserted the typewritten provision for giving notice with this expectation in mind. However, we find difficulty in implying from this insertion an intention to abrogate other specific references to alternative routes appearing in the same sentence of the charter parties, as it seems to us improbable that experienced businessmen, intent upon changing the terms of a printed contract, would act in so ambiguous and indirect a fashion. Moreover, if the contracts are construed to impose upon Hellenic a duty to perform via an alternative route in the event that Suez were closed, it is logical to imply an alternative obligation upon Glidden to give reasonable notice to the shipowner of the port selected for unloading.[3]

■ Because the words of the contracts are thus ambiguous, we turn to an examination of the surrounding circumstances for aid in their interpretation. Hellenic says that we may not do this, that we must find the meaning of the charter parties within the four corners of the instruments, and that it was error for the trial court to admit evidence of the negotiations leading up to the signing of the September 7 charter. We do not agree. Previous negotiations, as well as other circumstances surrounding the contract negotiations, are admissible

2. The distance from Koilthottam to New York via the Suez Canal is 8,405 miles; the distance via the Cape of Good Hope is 11,265 miles. The sailing time is approximately 25 days by the Suez route and 33½ days via the Cape of Good Hope. There was considerable dispute between the parties as to how great an effect the increased distance would have upon the cargo capacity of the vessels, the need for increased fuel and supplies, and the increased expenses to the shipowner.

3. From the placement of the commas in the relevant clause of the charter parties —the absence of a comma after "Suez Canal" and the presence of commas both before and after "or Panama Canal"—it may be argued that the "option" referred only to the substitution of the Panama Canal route for one of the other two routes and that hence, even on Hellenic's construction that the option was solely for the owner's benefit, Hellenic would be bound to perform so long as either the Suez or Cape of Good Hope route was available. However, we do not rely upon this argument in our decision.

to show what the parties intended in their adoption of ambiguous contract terms. Edward B. Marks Music Corp. v. Foullon, 2 Cir., 1949, 171 F.2d 905, 908; Restatement of Contracts § 242; 9 Wigmore on Evidence § 2470.

■ When we look to the negotiations leading to the signing of the charter parties, we find clear support for Glidden's interpretation. At the time of these negotiations, the Egyptian government had already nationalized the Suez Canal and the possibility of war in the Sinai Peninsula and the closing of the Canal were discussed in the public press and were recognized by the parties. In prior contracts with National Lead Company for the carriage of cargoes of ilmenite between similar points, Hellenic had sought and obtained a clause specifically excusing performance by it in the event that eastward transit of the Canal was impossible.[4] In its negotiations with Glidden, Hellenic urged that the charters include the same or a like provision, but Glidden, after consideration of the matter, rejected any such clause. Hellenic thereupon agreed to the charters without any frustration provision. The parties contracted with knowledge of the possibility that the Canal might be closed and elected not to include a provision protecting the shipper against this eventuality. We would not be justified in interpreting the agreements as accomplishing by implication the very thing to which the parties declined to agree in express language. In all likelihood the shipper did not suppose at the time of negotiations that the contract language excused his performance if the Suez Canal were closed, for there would then have been little reason to press for the inclusion of a specific clause. It is equally improbable that the charterer, having rejected such a clause, believed that the final agreement left upon it the risk of the Canal's closing. Moreover, had no reference to the route to be followed from India to the United States been made, the charterers would not have been frustrated simply by the closing of the most economical route. Albert D. Gaon & Co. v. Societe Interprofessionelle Des Oleagineux Fluides Alimentaires, [1959] 2 All E.R. 693; see Restatement of Contracts § 467. We conclude that the closing of the Suez Canal did not excuse performance by Hellenic, but that it remained under an obligation to perform by an alternative route.[5] Cf. Brightman & Co. v. Bunge y Born, [1924] 2 K.B. 619, aff'd, [1925] A.C. 799 (H.L.); P. N. Gray & Co. v. Cavalliotis, D.C.E.D.N.Y.1921, 276 F. 565, 571, affirmed per curiam, 2 Cir., 1923, 293 F. 1018; Restatement of Contracts § 469, Illustrations 3 and 4; Williston, Contracts § 1961.

■ What we have said thus far applies equally in rejecting Hellenic's arguments based upon the *force majeure* clause of the charters and § 4 of the Carriage of Goods by Sea Act. These provisions could only come into operation to exculpate Hellenic in the event it was prevented from performing by one of the causes therein described. Since we have already decided that Hellenic was under a duty to perform by an alternative route these provisions have no applicability.

■ Hellenic raises two further arguments which relate only to the last

---

4. The clause is as follows:
   "Effective closure of the Suez Canal, preventing eastward transit of the Owners' vessels to the Persian Gulf-Indian Ocean area, shall be deemed to be frustration of the Owners' obligation to tender such vessels to the Charterers for loading and of the Charterers' obligation to ship under this Agreement, as long as the Suez Canal remains closed."

5. Even under the frustration provision in the National Lead charters proposed by Hellenic for inclusion in the agreements with Glidden, see footnote 4 *supra*, we doubt that Hellenic could have escaped liability for its refusal to perform the first charter, since the specific frustration clause only excused performance if "eastward transit" of the Canal were prevented. The vessel nominated by Hellenic to perform the first charter with Glidden, the Hellenic Sailor, was already east of Suez at the time the Canal was closed.

three charters. It asserts first, that since these agreements were not signed by either party, they were not binding contracts and, second, that Pendias, its assistant to the general manager, had no authority to enter into charter parties on its behalf. The trial judge rejected both of these claims and since they involve determinations of fact, we may not reverse his findings unless they are clearly erroneous. Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. The findings are supported by the record.

■ The first of these questions turns upon whether the parties intended to be bound at the time they orally agreed upon the terms of the contract or whether it was the intention of both of them, or the intent of either manifested to the other, not to be bound until a formal written document was executed. Banking & Trading Corp. v. Floete, 2 Cir., 1958, 257 F.2d 765; Restatement of Contracts §§ 25, 26. Here, the fact that the charters involved large sums of money, were to be performed over a considerable period of time, and contained numerous details all suggest that written agreements were intended. On the other hand, the fact that the contracts were similar to one previously agreed to by the parties and that the negotiations immediately preceeding November 1 were confined to bargaining about the freight rate suggests that the parties, once agreement was reached upon the price, intended to be bound. Moreover, a letter from Hellenic to Glidden's chartering broker, written on November 8, lends strong additional support to the trial court's conclusion. In this letter by Hellenic by its assertion that the three charter parties were frustrated by the closing of the Canal impliedly acknowledged that prior to this event it regarded the contracts as binding.

■ Similarly, the trial court's determination that Pendias was authorized to act for Hellenic is justified by the record. The same letter from Hellenic referred to above supports the view that Hellenic regarded its agent's conduct as binding upon it. There was also abundant other evidence to support the court's finding that Pendias had either authority or apparent authority to enter into the charters. He had signed the earlier charter for Hellenic by his own signature, as well as virtually all of the extensive correspondence among Hellenic, Glidden and Glidden's broker; all the negotiations with Glidden had been carried on by him alone.

Because the trial court decided that the charter parties were frustrated, it received no evidence and made no findings of the plaintiff's damages. We therefore remand the case for the determination of this question.

Reversed and remanded.