**FASHION FABRICS OF IOWA, INC.,**
**d/b/a Fashion Place, Appellee,**

v.

**RETAIL INVESTORS CORPORATION,**
**d/b/a Fashion Place Ready-to-Wear,**
**and Moss Stores, Inc., Appellants.**

**No. 60400.**

Supreme Court of Iowa.

May 17, 1978.

Victor V. Sprengelmeyer, of Sprengelmeyer & Henkels, Dubuque, for appellants.

O'Connor, Thomas, Wright, Hammer, Bertsch & Norby, Dubuque, for appellee.

Considered by MOORE, C. J., and LeGRAND, REES, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

The determinative question in this appeal is whether a commercial sublease contained an implied covenant by the sublessor to continue operating its adjacent business during the term of the sublease. The trial court held it did not. We hold it did and therefore reverse and remand.

This appeal arises from judgment entered for plaintiff Fashion Fabrics of Iowa, Inc. (Fashion Fabrics), d/b/a Fashion Place, in its action for rent against defendants Retail Investors Corporation (Retail Investors), d/b/a Fashion Place Ready-to-Wear, and Moss Stores, Inc. (Moss).

Fashion Fabrics sells fabrics, patterns and accessories at retail to customers who wish to make their own clothing. Moss sells women's apparel at retail. Retail Investors performs management services for Moss.

Fashion Fabrics leased approximately 26,000 square feet of space in the Kennedy Mall shopping center in Dubuque. On March 17, 1974, it entered an agreement to sublease approximately 6,700 square feet of this space to Moss. This space was accessible from the main and side malls and from Fashion Fabrics' adjacent space. The sublease had a term of three years with an annual rent fixed at $24,753, payable in monthly installments of $2,063, or ten percent of Moss's gross sales in the leased space, whichever was greater. Moss subsequently assigned the sublease to Retail Investors. Because Moss and Retail Investors are in the same position in this appeal, we will refer to them both as "Moss".

Moss commenced occupancy in April 1974. Fashion Fabrics had been operating its business in the adjacent space for some time. On October 16, 1974, Fashion Fabrics notified Moss by letter of its intention to terminate its Dubuque operation. After conducting a going-out-of-business sale in November, it vacated its premises on November 16, 1974. Several weeks later Fashion Fabrics rented the vacated space to Flower City, a retail business which sells live and artificial plants, flowers and decorations.

On December 31, 1974, Moss wrote Fashion Fabrics that it intended to vacate the premises on or before January 31, 1975, alleging the sublease was based on Fashion Fabrics' continuing in business at the site, Moss had incurred damages because of the closing, and the closing excused Moss from further performance.

Moss closed its doors January 22, 1975, and was packing its remaining merchandise the following day when Fashion Fabrics brought this action for rent and penalty under the sublease. The action was accompanied by attachment of Moss's inventory.

In its answer Moss alleged as an affirmative defense that Fashion Fabrics had materially breached the sublease in ceasing its

operation on the adjacent premises in November 1974. This allegation was also the basis of a counterclaim in which Moss sought damages.

After trial to the court at law, the trial court held Moss breached the sublease by vacating the premises. It awarded Fashion Fabrics judgment of $24,567 for rent through September 1975 and for an early-termination penalty provided in the sublease. This appeal followed.

■ In order to decide the appeal we must review the trial court's interpretation and construction of the sublease. This task is governed by principles of interpretation and construction of contracts generally. *Baron v. Crossroads Center of Iowa, Inc.,* 165 N.W.2d 745, 749 (Iowa 1969).

■ Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect. Interpretation is reviewed as a legal issue unless it depended at the trial level on extrinsic evidence. Construction is always reviewed as a law issue. *Allen v. Highway Equipment Co.,* 239 N.W.2d 135, 139 (Iowa 1976).

The trial court did not deem it necessary to consider extrinsic evidence in determining the meaning of the sublease in this case. Therefore, its interpretation and construction are both reviewed here as matters of law. *Connie's Const. v. Fireman's Fund Ins.,* 227 N.W.2d 207, 210 (Iowa 1975); see *Santa Clara Properties Co. v. R.L.C., Inc.,* 217 Cal.App.2d 840, 32 Cal.Rptr. 333 (1963); 3 Corbin on Contracts § 554 (1960).

■ Although the trial court refused to consider it in determining the meaning of the sublease, substantial extrinsic evidence was received in this case. We have held extrinsic evidence is admissible as an aid to interpretation when it throws light on the situation of the parties, antecedent negotiations, the attendant circumstances and the objects they were striving to attain. *Hamilton v. Wosepka,* 261 Iowa 299, 306, 154 N.W.2d 164, 168 (1967).

■ Extrinsic evidence is also admissible before the issue of interpretation is reached in order to determine whether the writing is or is not an integrated agreement or whether, if integrated, it is completely or partially integrated. Restatement (2d) of Contracts § 240 (Tent. Draft 1–7).

We believe the trial court erred in failing to consider the extrinsic evidence for each purpose. We base this conclusion on a review of the writing and the extrinsic evidence.

In its opening clause the sublease provided:

WHEREAS, FASHION FABRICS OF IOWA, INC. conducts a store in premises which it leases within the Kennedy Mall, Dubuque, Iowa.

WHEREAS, *the parties desire to establish a Ladies Ready-to-Wear Department in said store* for the sale at retail of the articles, merchandise and services set forth in ARTICLE TWO hereof, on the terms and conditions hereinafter set forth, * * *. (emphasis supplied).

In article two of the sublease, under the title "USE", the sublease provided:

[Fashion Fabrics] grants to Moss the right and privilege of conducting in the Moss Space *in said Store during the period of this Agreement a Ladies Ready-to-Wear Department,* including the right to display, offer for sale and sell at retail ladies' new ready-to-wear soft apparel * * *. [Fashion Fabrics] agrees not to permit the sale from the Store by [it] or any other sublessee of [Fashion Fabrics] *within the store premises* of ladies' ready-to-wear soft apparel or accessories. (emphasis supplied)

The sublease contained additional provisions showing a close working relationship between the two businesses. Fashion Fabrics promised to furnish Moss with wrapping supplies and to pay bank charges for credit purchases made by customers of Moss on bank credit cards. Moss agreed to furnish its own trade fixtures and cash desk. Each agreed to conduct its business without interfering or competing with jeopardizing or obstructing the business of the other. Then the sublease contained this provision:

Moss agrees at all times [Fashion Fabrics] is open for business to have at least one employee present in the Moss Space to conduct Moss's business. [Fashion Fabrics] will provide Moss with a written schedule of [its] business hours. *It is further understood and agreed between the parties that Moss's business in the Moss Space shall only be open for business the same hours that [Fashion Fabrics] is open and that under no circumstances shall Moss's business be open on Sundays.* (emphasis supplied).

After reviewing the sublease the trial court rejected Moss's contention that Fashion Fabrics had covenanted to keep its own business operating during the term of the lease. The court held the only language supporting the contention was the reference at the outset to the parties' desire to establish the Moss business as a ladies' ready-to-wear department in the Fashion Fabrics store. The court said this language was surplusage at best.

We do not agree. Courts must strive to give effect to all the language of a contract. *Gendler Stone Products Co. v. Laub*, 179 N.W.2d 628, 630 (Iowa 1970). Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. Restatement (2d) of Contracts § 229 (Tent. Draft 1–7). Considering the additional language of the sublease, especially that which limits Moss's business hours to Fashion Fabrics' business hours, we do not think the parties' characterization of the Moss operation as a ladies ready-to-wear department of Fashion Fabrics' store can be characterized as surplusage.

We also think the trial court should have considered the extrinsic evidence in order to determine what the parties meant by the language used. See *Pappas v. Hauser*, 197 N.W.2d 607 (Iowa 1972).

Extrinsic evidence showed Fashion Fabrics had at least tentatively committed itself to rent space in stores of Moss in Burlingame, California, and Reno, Nevada, when the parties negotiated the Dubuque sublease. In the California and Nevada stores the roles were to be reversed, with Moss operating the host stores and Fashion Fabrics operating departments within them. The departments were to operate as concessions of the main store.

A concession lease is based on the principle that the host store generates customer traffic for the smaller enterprise and, in turn, benefits because it receives a rental which at some point increases as gross sales of the concession increase. For the concessionaire to benefit from customer traffic, the businesses must be compatible. The host must attract customers likely to have some interest in what the smaller unit has to sell.

The host store is frequently a general merchandiser, and the concessionaire is often a specialty business. In its purest form the concession lease provides the host a percentage of all sales of the guest enterprise. In addition to the benefit from increased customer traffic, the concessionaire has the advantage of having a relatively small fixed investment.

Against this background the parties negotiated the Dubuque lease. Fashion Fabrics had obtained the Kennedy Mall space at what it believed was a bargain rental and contacted Moss in an effort to sublet space for a women's apparel concession in the store. Fashion Fabrics insisted it would not enter the Burlingame lease unless Moss entered a reciprocal arrangement in Dubuque.

Moss sent sample concession leases to Fashion Fabrics, and a draft sublease was prepared. No evidence was adduced to show which party actually chose the language of the sublease, and it appears it went through more than one revision before being signed.

Maurice Hack, president of both Moss and Retail Investors, negotiated the sublease for Moss. He testified it was his intention that the Dubuque sublease be a

concession lease like those in his companies' other stores in which the continued operation of the host store was essential.

Stanford E. Shaw, secretary and general counsel for Fashion Fabrics, denied that the Dubuque sublease was a concession agreement. He said it was simply a rental of space for a fixed rent. He relied on the fact Fashion Fabrics would not derive a profit from each sale made by Moss until or unless ten percent of Moss's gross sales exceeded the fixed rental. He also pointed out a concession ordinarily operates in a store selling general merchandise rather than in a specialty store like Fashion Fabrics.

The record includes evidence that Moss expressed a desire to open on Sunday shortly after commencing its operation. Fashion Fabrics agreed to this deviation from the lease only upon a temporary security barrier being erected by Moss to prevent access to the Fashion Fabric space from the Moss space during Sunday hours.

We believe the writing and extrinsic evidence, when considered together as they must be in this case, show, as a matter of law, an implied covenant by Fashion Fabrics to continue operating its business on the adjacent premises during the term of the sublease.

■ Insofar as this holding constitutes our interpretation of the sublease based in part on extrinsic evidence, we think the extrinsic evidence when considered with the language of the writing is so clear no reasonable person could reach a different conclusion. See 4 Williston on Contracts § 616 at 661–663 (Third Ed. 1961). Because the record does not show which party chose the language of the sublease, we do not apply the principle here that doubtful language in a written instrument is construed against the party which selected it. Cf. *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976).

■ However, we do rely on the uncontroverted evidence that Moss attached the meaning to the sublease which it contends for here, that Moss had no reason to know of a different meaning attached by Fashion Fabrics, and that Fashion Fabrics had reason to know the meaning attached by Moss. In these circumstances Moss's meaning must prevail. § 622.22, The Code ("When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it."); *Curran Hydraulic Corporation v. National Ben Franklin Insurance Company of Illinois*, 261 N.W.2d 822, 826 (Iowa 1978); Restatement (2d) of Contracts § 227 (Tent. Draft 1–7).

We also rely on the fact Fashion Fabrics' evidence concerning the sublease did not explain the meaning of language used but went instead to the issue of its legal effect. This is a matter of construction which we decide as a law question, and we disagree with the construction contended for by Fashion Fabrics.

■ Contractual obligations may arise from implication as well as from the express writing of the parties. "A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face." *Freeport Sulphur Co. v. American Sulphur Royalty Co. of Texas*, 117 Tex. 439, 451, 6 S.W.2d 1039, 1042 (1928). As Justice Cardozo said in the oft-cited case of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917):

> The law has outgrown its primitive state of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be "instinct with an obligation", imperfectly expressed * * .

■ Courts are slow to find implied covenants. The obligation must arise from the language used or it must be indispensable to give effect to the intent of the parties; it must have been so clearly within their contemplation that they deemed it unnecessary to express it. It can be justified only on

the ground of legal necessity and can arise only when it can be assumed it would have been made part of the agreement if attention had been called to it. Moreover, an implied covenant cannot be found when the contract is fully integrated. *Cousins Inv. Co. v. Hastings Clothing Co.,* 45 Cal.App.2d 141, 149, 113 P.2d 878, 882 (1941). See also *Carter v. Certain-Teed Products Corp.,* 102 F.Supp. 280 (N.D.Iowa 1952), remanded, 200 F.2d 754 (8 Cir. 1953); I Friedman on Leases 138–139 (1974).

Nevertheless, courts confronted with commercial lease disputes have recognized the existence of implied covenants to continue operating a business on leased premises in two general situations. One involves the lessee and the other the lessor. In each situation the implication arises from circumstances which include a relationship of significant economic interdependence. See, e. g., *Ingannamorte v. Kings Super Markets, Inc.,* 55 N.J. 223, 260 A.2d 841 (1970); *Tooley's Truck Stop, Inc. v. Chrisanthopouls,* 55 N.J. 231, 260 A.2d 845 (1970).

When rent is fixed exclusively or primarily on the basis of a percentage of the lessee's gross revenues or profit, an obligation on the part of the lessee to continue operating in good faith has been implied. See *Fox v. Fox Valley Trotting Club,* 8 Ill.2d 571, 134 N.E.2d 806 (1956); *Seggebruch v. Stosor,* 309 Ill.App. 385, 33 N.E.2d 159 (1941); *Marvin Drug Co. v. Couch,* 134 S.W.2d 356 (Tex.Civ.App.1939); *Stoddard v. Illinois Imp. & Ballast Co.,* 275 Ill. 199, 113 N.E. 913 (1916); 2 Powell on Real Property ¶ 242[2] at 372.27 (1977); 3 Corbin on Contracts § 568 at 331 (1960); compare *Kroger Co. v. Bonny Corp.,* 134 Ga.App. 834, 216 S.E.2d 341 (1975) (percentage of sales rent provision did not result in significant increase in rent paid); *Cousins Inv. Co. v. Hastings Clothing Co., supra* (substantial minimum rent provision).

An implied covenant of a landlord to continue operating in adjacent premises was recognized in *Lilac Variety, Inc. v. Dallas Texas Co.,* 383 S.W.2d 193 (Tex.Civ.App. 1964).

We believe the present situation falls within the principles applied in the cases in which implied covenants have been found.

The decision of the Court of Civil Appeals of Texas in *Lilac Variety, Inc. v. Dallas Texas Co., supra,* was made in analogous facts. The case involved a shopping center lease. When a major tenant of the shopping center ceased business but continued paying rent, one of the smaller tenants sought to break the lease on the basis that the developer had by implication covenanted to insure continued operation by the major tenants. Stressing the economic interdependence of the tenants, the court found an implied covenant of continued operation by major tenants in the lease, stating:

> We think it is common knowledge that the volume of pedestrian traffic at the site of a retail merchandising business is a factor which affects the gross sales potential of the business. That being so the purpose and the importance to appellants of the lease provisions with reference to a supermarket are obvious. Plainly the parties intended that a supermarket should be in operation during the term of the lease. We find it impossible to believe that when the parties entered into this lease agreement it was intended that the particular lease provision in question would be satisfied if A.C.F. Wrigley Stores should continue to pay rent on an idle store building after discontinuing operation of the supermarket.
>
> It is true, as appellee says, the lease contract does not in exact words stipulate that A.C.F. Wrigley Stores will not discontinue operation of the supermarket during the term of the lease, but we believe such a provision is necessarily implied from the plain language of the agreement. 383 S.W.2d 196.

See also *Coulter v. Norton,* 100 Mich. 389, 59 N.W. 163 (1894).

Cases refusing to recognize an implied covenant by the lessor to continue operating are distinguishable because the leases in those cases were found to be fully integrated, foreclosing recognition of implied covenants. See *Fuller Market Basket, Inc. v.*

*Gillingham & Jones, Inc.*, 14 Wash.App. 128, 539 P.2d 868 (1975); *S. H. Kress & Co. v. Desser and Garfield, Inc.*, 193 So.2d 192 (Fla.App.1966). The sublease in the present case does not contain an integration clause, and we find it was not wholly integrated.

 We think the additional conditions for recognizing an implied covenant are satisfied here. The writing characterizes the Moss operation as a department of Fashion Fabrics' store. It establishes a relationship of economic interdependence, even to the details of Fashion Fabrics paying certain bank charges of Moss and keeping Moss supplied with wrapping paper. The provision barring Moss from operating during hours when Fashion Fabrics was not operating constitutes strong evidence that the parties contemplated Fashion Fabrics would keep its store open for the duration of the sublease.

When considered in the context of the other terms of the sublease and the extrinsic evidence showing the background of the agreement, the sublease is "instinct with an obligation" of Fashion Fabrics to continue its adjacent operation.

We hold the trial court erred in finding Fashion Fabrics did not covenant to continue its business in the adjacent Kennedy Mall space during the term of the sublease. Consequently the court erred in holding Fashion Fabrics did not breach the sublease when it vacated the premises in November 1974. The breach was material and substantial. We thus hold Moss established its defense in relation to Fashion Fabrics' claim for the penalty and for rent for the period after Moss terminated its tenancy on January 31, 1975. See *The Maytag Co. v. Alward*, 253 Iowa 455, 112 N.W.2d 654 (1962); Restatement (2d) of Contracts § 262 (Tent. Draft No. 8) ("it is a condition of each party's remaining duties to render performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time").

However, the January 1975 rental installment of $2063 was not paid and Moss acknowledges its responsibility for it.

 The trial court held against Moss on its counterclaim for failure of proof of damages. Moss lost money on its operation during the period of its tenancy. We cannot say Moss proved damages as a matter of law. See *Roland A. Wilson v. Forty-O-Four Grand Corp.*, 246 N.W.2d 922, 925 (Iowa 1976). Therefore we have no basis to interfere with the court's denial of the counterclaim.

We reverse and remand for entry of judgment for plaintiff in the amount of the January 1975 rent, with interest at seven percent per annum from January 31, 1975, until paid.

Costs to plaintiff.

REVERSED AND REMANDED.