AMERICAN SOIL PROCESSING,
INC., Appellee,

v.

IOWA COMPREHENSIVE PETROLE-
UM UNDERGROUND STORAGE
TANK FUND BOARD, Appellant.

No. 96–1778.

Supreme Court of Iowa.

Nov. 25, 1998.

As Corrected Dec. 7, 1998.

326

Thomas J. Miller, Attorney General, and Dean A. Lerner and Robert C. Galbraith, Assistant Attorneys General, for appellant.

Douglas E. Gross, James H. Gilliam and Miranda L. Hughes of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellee.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and CADY, JJ.

LAVORATO, Justice.

A state agency agreed to provide the plaintiff with a yearly minimum amount of contaminated soil under a soil remediation contract. When the agency failed to provide the soil as agreed, the plaintiff sued, seeking damages pursuant to a liquidated damages provision in the contract. Both parties moved for summary judgment.

The agency argued that its failure to provide the requisite amount of soil was due to governmental action not under its control. For that reason, the agency argued it was excused under the contract's *force majeure* clause.

The district court concluded the liquidated damages provision constituted an alternative performance rather than a liquidated damages clause. Because the agency could pay the liquidated damages, which was one of the two alternatives, the court found for the plaintiff and sustained its motion for summary judgment and denied the agency's motion. We granted the agency's interlocutory appeal. We reverse and remand with directions.

## I. Facts.

American Soil Processing, Inc. (ASPI) is an Iowa corporation operating out of Marion, Iowa. Iowa Comprehensive Petroleum Underground Storage Tank Board (Board) is a state agency established under Iowa Code chapter 455G (1995).

In 1989 the legislature enacted the Iowa Comprehensive Petroleum Underground Storage Tank Fund Act. *See* 1989 Iowa Acts ch. 131 (now codified at chapter 455G). The act was a comprehensive law relating to petroleum underground storage tanks. The purpose of the act was to alleviate the severe financial hardship new federal regulations would impose on the average owner or operator of a gasoline station in Iowa. The act established the Iowa Comprehensive Petroleum Underground Storage Tank Fund (Fund).

Among other things, the Fund provides an eligible owner or operator assistance in paying for corrective action to clean up existing petroleum contamination. *See* Iowa Code § 455G.9. This type of assistance was the underlying reason for the agreement in question. The agreement provided the Board with a method to assist owners and operators in cleaning up their petroleum-contaminated soil according to legislative directive and Iowa Department of Natural Resource (IDNR) requirements. The Board's authority to contract with ASPI to pay for corrective action is statutory. *See* Iowa Code § 455G.12A.

The Board and ASPI first entered into a working relationship under the terms of a "Pilot Project Agreement" (PPA) in March 1991. ASPI proposed, and the Board approved, its method of mechanical remediation to clean the soil. The PPA defines mechanical remediation as the process of cleaning soil contaminated with Number 2 or lighter petroleum fuels by heating the soil to such a degree that the petroleum is removed as a pollutant.

In the PPA, the Board agreed for a five-year period to supply ASPI with a minimum quantity of 100,000 tons of contaminated soil per twelve-month period of processing. The Board agreed to pay $34 for each ton of contaminated soil processed, subject to quarterly adjustments based upon the amount of soil actually received in the previous quarter. Additionally, the Board guaranteed ASPI a 15% annual rate of return on ASPI's investment in capital and equipment.

The parties began performing pursuant to the PPA in 1991. During 1991 and 1992, the Board supplied less than the required minimum of contaminated soil. Thus, the Board paid ASPI the contract price plus an additional amount in accordance with the agreement's guaranteed rate of return provision.

In 1993, the Board persuaded ASPI to modify the PPA. The Board believed that the PPA had a number of ambiguities and that the Board was having trouble supplying the required tons of contaminated soil. Thus, in June 1993, the parties executed a "Pricing Agreement for Mechanical Remed-

iation of Petroleum Contaminated Soil" (Agreement). One provision of the Agreement provided that it "supersedes and replaces all previous written or oral agreements between the parties." In the Agreement, the Board "warrants that it will supply [ASPI] with at least twenty thousand tons of petroleum-contaminated soil during each of the four Agreement years in the terms of the Agreement." ASPI warranted that it would "accept and receive up to one hundred ten thousand tons of contaminated soil supplied to [ASPI] by the Board."

A provision of the Agreement that is at the heart of this controversy provided:

> If in an Agreement year, the Board is not able to supply the twenty thousand ton minimum amount of petroleum contaminated soil required by Article V(a) of this Agreement, the Board will pay [ASPI] liquidated damages of $70.38 for each ton the amount of Board[-]supplied soils falls short of the required twenty thousand ton minimum. This amount represents a reasonable estimate of [ASPI's] damages associated with the Board's inability to supply petroleum-contaminated soils.

The Agreement was to last for a term of four fiscal years.

In the 1995 fiscal year, the Board supplied 12,005.19 tons of contaminated soil. This was 7,994.18 less than the Board agreed to provide. For the fiscal year 1996, the Board supplied ASPI 6,810 tons of contaminated soil or 13,189.56 tons less than the Board agreed to provide. The Board has refused to pay liquidated damages for the shortfalls in these two fiscal years.

## II. Proceedings.

The Board's failure to pay the liquidated damages for fiscal years 1995 and 1996 prompted ASPI to sue the Board for these damages. The Board raised an affirmative defense of *force majeure* based on the following provision in the Agreement:

> *Force majeure.* The parties shall not be liable to each other for failure to perform their obligations under this Agreement due to events, actions, or contingencies beyond their reasonable control, including but not limited to, strikes, explosion, accident, flood, sabotage, riots, war, fire, acts of God; compliance with any law, regulation, or order of the United States of America, or any governmental body or any instrumentality thereof, or any one of the states of the United States of America, or any governmental body or instrumentality thereof; coercive action of regulatory agencies; court injunction or order; or lack of adequate fuel, power, raw materials, labor, or transportation facilities; provided, however, that the parties shall work diligently to remove any such contingency.

Both parties moved for summary judgment. ASPI relied on the liquidated damages provision and the fact that it was undisputed that the Board had failed to supply the minimum tonnage called for by the Agreement in the two fiscal years in question. Thus, it argued it was entitled to approximately $1,100,000 in damages.

The Board contended that the actions of the IDNR prevented it from supplying the 20,000 minimum tonnage in each of the two fiscal years in question. Because of this, the Board argued its nonperformance was excused by the *force majeure* provision in the Agreement.

The district court found that the Agreement was plain and unambiguous and that the parties' intent could be gleaned from its language. For the purposes of the motions, the court assumed that the IDNR regulations effectively frustrated the Board's efforts to supply ASPI with the required 20,000 tons of contaminated soil in each of the fiscal years in question. Nevertheless, the district court concluded the *force majeure* provision did not excuse the Board from paying the liquidated damages under the Agreement.

The court reached this conclusion by interpreting the Agreement as imposing alternative obligations on the part of the Board: (1) provide the required amount of contaminated soil or (2) pay the liquidated damages. The district court further concluded that in these circumstances the following rule should apply: When a promisor can perform a contract in either of two alternative ways, the

impracticability of one does not excuse the promisor if the performance by the other of the alternative means is still practicable.

Applying the rule to the facts, the court found that the IDNR's actions only prevented the Board from performing the first obligation: providing the required tonnage of contaminated soil. The IDNR's actions, however, did not prevent the Board from performing the alternative obligation: paying the liquidated damages. For these reasons, the court concluded the *force majeure* provision did not apply. In short, the Agreement in plain and unambiguous terms required the Board to provide the minimum tonnage of contaminated soil or pay liquidated damages if the Board provided less.

The district court therefore granted ASPI's motion for summary judgment and denied the Board's motion. The court, however, determined that the measure and amount of damages were factually disputed and for that reason set for trial the amount of damages the Board must pay ASPI.

The Board appealed from the district court's ruling granting ASPI's motion for summary judgment and denying its own motion for summary judgment. The Board contends the Agreement is not an alternative performance provision as the district court concluded. Rather, the Agreement is a contract with a liquidated damages provision. For these reasons, the Board insists that the district court should have sustained its motion for summary judgment.

### III. Scope of Review.

Our review of summary judgment rulings is for correction of errors at law. Iowa R.App. 4. We must determine whether genuine issues of material fact exist and whether the district court correctly applied the law. *Hegg v. Tri-County REC,* 512 N.W.2d 558, 559 (Iowa 1994). Where the only controversy concerns the legal consequences flowing from undisputed facts, summary judgment is the proper remedy. *McClendon v. Beck,* 569 N.W.2d 382, 384 (Iowa 1997).

### IV. Alternative Contract Versus Contract With Liquidated Damages Provision.

The decisive issue in this appeal is whether the Agreement is an alternative contract or a contract with a liquidated damages provision. To decide this question, we must review the district courts interpretation and construction of the Agreement. General principles of contract interpretation and construction govern our task.

When the district court interprets the words of a contract, it determines the meaning of words in the contract. *Fashion Fabrics v. Retail Investors Corp.,* 266 N.W.2d 22, 25 (Iowa 1978). When the court construes a contract, it decides the legal effect of such words. *Id.* We review the district court's interpretation as a legal issue unless the court used extrinsic evidence to interpret the words of the contract. *Id.* We always review the district court's construction of a contract as a legal issue. *Id.*

When we are reviewing the district court's construction of a contract, we must keep in mind the cardinal rule that the intent of the parties controls. Iowa R.App. P. 14(f). Except in cases of ambiguity, we determine such intent from what the contract says. *Id.* Thus, if the parties' intent is clear and unambiguous from the words of the contract, we enforce the contract as written. *Howard v. Schildberg Constr. Co.,* 528 N.W.2d 550, 555 (Iowa 1995).

The parties agreed, and the district court determined, that the Agreement was plain and unambiguous and that the parties' intent could be gleaned from what the Agreement said. We agree the Agreement is plain and unambiguous; however, for reasons that follow we construe the Agreement differently.

**A. The basis for the district court ruling.** As mentioned, the district court construed the Agreement as imposing two obligations on the Board: (1) provide the minimum tonnage of contaminated soil in a given Agreement fiscal year or (2) pay the liquidated damages for each ton under the agreed minimum. The court concluded that even assuming the IDNR's actions prevented the Board from providing the

minimum tonnage, such actions did not prevent the Board from paying the liquidated damages. In construing the Agreement in this manner, the district court relied heavily on Restatement (Second) of Contracts section 261 comment f (1981).

■ Restatement (Second) of Contracts section 261 provides for discharge of a contractual obligation when there is a supervening impracticability:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*Id.*

■ This rule recognizes that even though a party in assuming a duty has not qualified the language of the party's undertaking, the court may still relieve the party of that duty "if performance has unexpectedly become impracticable as a result of a supervening event." Restatement (Second) of Contracts § 261 cmt. a, at 313.

■ Comment f to section 261 recognizes one situation where this general rule does not apply:

*Alternative performances.* A contract may permit a party to choose to perform in one of several different ways, any of which will discharge his duty. Where the duty is to render such an alternative performance, the fact that one or more of the alternatives has become impracticable will not discharge the party's duty to perform if at least one of them remains practicable. *The form of the promise is not controlling, however, and not every promise that is expressed in alternative form gives rise to a duty to render an alternative performance.* For example, a surety's undertaking that either the principal will perform or the surety will compensate the creditor does not ordinarily impose such a duty. *Nor does a promise either to render a performance or pay liquidated damages impose such a duty.*

*Id.* (emphasis added) (citations omitted). As the italicized language says, the form of a promise is not controlling, and a promise either to render a performance or pay liquidated damages does not necessarily impose a duty to render alternative performances.

Illustration 15 to comment f is a classic example of a contract to render alternative performances:

On June 1, A contracts to sell and B to buy whichever of three specified machines A chooses to deliver on October 1. Two of the machines are destroyed by fire on July 1, and A fails to deliver the third on October 1. A's duty to deliver a machine is not discharged, and A is liable to B for breach of contract. If all three machines had been destroyed, A's duty to deliver a machine would have been discharged, and A would not have been liable to B for breach of contract.

*Id.* at 319; *see Glidden Co. v. Hellenic Lines,* 275 F.2d 253, 257 (2d Cir.1960) (involving an alternative performance with a *force majeure* clause; contract provided that shipper could deliver by way of the Suez Canal, the Cape of Good Hope, or the Panama Canal; holding that *force majeure* clause did not excuse shipper from using Cape of Good Hope or Panama Canal when war prevented shipper from using Suez Canal, the most economical route).

Illustration 16 to comment f is an example of a contract with a liquidated damages provision, and not a contract for alternative performances:

A contracts to repair B's building. The contract contains a valid provision requiring A to pay liquidated damages if he fails to make any of the repairs. S is surety for A's performance. Before A is able to begin, B's building is destroyed by fire. Neither A's nor S's duty is one to render an alternative performance. As duty to repair the building is discharged, and A is not liable to B for liquidated damages or otherwise for breach of contract. S's duty as surety for A is also discharged, and S is not liable to B for breach of contract.

*Id.* at 319–20. Obviously, A's duty is made impracticable due to the destruction of the

building by fire. For this reason, A's duty is discharged.

**B. *Public Service Co. v. Burlington Northern Railroad*, 53 F.3d 1090 (10th Cir. 1995) and *Superfos Investments Ltd. v. FirstMiss Fertilizer, Inc.*, 821 F.Supp. 432 (D.C.Miss.1993).** The Board relies heavily on *Public Service* and *Superfos* in support of its position that the Agreement is simply a contract with a liquidated damages provision and not an alternative contract. We agree these cases are persuasive authority supporting the Board's position.

**1. *Public Service Co. v. Burlington Northern Railroad*.** The plaintiff, an electric company, entered into an agreement with the defendant, a railroad company. The defendant agreed to transport plaintiff's coal at the rate of $14 per ton to the plaintiff's electric generating facilities in Oklahoma; the plaintiff agreed to tender a minimum of 2,600,000 tons of coal for each year of a long-term contract. The contract also had the following pertinent provision: "In the event that [the plaintiff] fails to tender to [the defendant] for transportation the agreed to minimum annual volume requirement for any calendar year as required under this agreement," then the plaintiff "shall have a 'tonnage shortfall' [for which it shall pay the defendant] ... liquidated damages...." *Public Serv.*, 53 F.3d at 1093.

After several years, the plaintiff decided it was more economical to pay liquidated damages and ship the coal through another shipper, which charged less than the plaintiff had agreed to pay the defendant. The defendant asserted the plaintiff had breached the agreement when the plaintiff began shipping through other shippers. The plaintiff brought a declaratory judgment action and moved for summary judgment. The district court ruled that the minimum tonnage and liquidated damages provisions constituted a contract for "alternative performance," which allowed the plaintiff to unilaterally reduce its minimum annual tonnage commitment to the defendant. *Id.* at 1095–96.

As here, the parties and the trial court in *Public Service* agreed the contract was unambiguous. *Id.* at 1097. The appellate court likewise concluded the contract was unambig-

uous but determined, contrary to the trial court, that the contract was not an "alternative performance" contract. *Id.* at 1097–98. Citing 5 Corbin, *Corbin on Contracts*, section 1082, at 462 (1964), the court emphasized that "a contract with a liquidated damages provision is not an alternative contract." *Public Serv.*, 53 F.3d at 1098. The court cited with approval this additional explanation found in Corbin, section 1082, at 462:

> Where a contractor promises to render a certain performance or, in default thereof, to pay a definite sum as liquidated damages, he has not made an alternative contract.... It is evident that some alternative contracts giving the power of choice between the alternatives to the promisor can easily be confused with contracts that provide for the payment of liquidated damages in case of breach, provided that one of the alternatives is the payment of a sum of money.... If, upon a proper interpretation of the contract, it is found that the parties have agreed that either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange and equivalent for the return performance rendered by the promisee, the contract is a true alternative contract.

*Public Serv.*, 53 F.3d at 1098–99.

Applying Corbin's explanation to the facts, the court held that the plaintiffs commitment to ship the annual minimum tonnage of coal via the defendant's railroad "was not set forth in the Agreement as 'one of the two alternative performances ... to be given' by the plaintiff." *Id.* at 1099. The court accordingly held that the trial court had erred in concluding otherwise. *Id.*

**2. *Superfos Investments Ltd. v. First-Miss Fertilizer, Inc.*** *Superfos* was somewhat different from *Public Service*. In *Superfos*, the defendant agreed to buy a minimum of 80,000 tons of anhydrous ammonia in each year of the contract. Unlike the contract in *Public Service*, the contract in *Superfos* had no express liquidated damages provision. Instead, the contract obligated the defendant to make payment for any deficiency in purchases as

though the required minimum annual volume of the product had been delivered.

The defendant moved for summary judgment, contending that the provision calling for payment of any deficiency in purchases at the purchase price was a penalty for failure to perform. The plaintiff countered, contending that the challenged contract was "a typical 'take-or-pay' contract, which is reasonable, just and enforceable according to its terms." *Superfos*, 821 F.Supp. at 433. The plaintiff argued that like the typical take-or-pay contracts, the challenged provision was merely an alternative performance provision "in which the alternatives of taking and paying for the requisite annual volume, on the one hand, and on the other hand of paying for product not taken, are merely the buyer's alternative methods of performing its bargain." *Id.*

This case is significant because ASPI relies on take-or-pay cases to support its position. Additionally, the district court thought that the challenged language in the Agreement and the typical take-or-pay contracts are somewhat analogous.

The trial court in *Superfos* framed the issue this way: Was "the contract a true 'alternative performance' contract (giving the buyer the option of taking and paying for product or of paying for product not taken), or [was it,] in fact, one which provides for a primary obligation (taking and paying for product) with provision for the payment of liquidated damages or a penalty (paying for product not taken) as a means of encouraging or ensuring the buyers performance of the primary obligation[?]" *Id.*

Before resolving the issue, the court found the following explanation of alternative performance contracts persuasive:

A contract may give an option to one or both parties either to perform a specified act or to make a payment; and though this form of contract cannot be used as a cover for the enforcement of a penalty, yet if on a true interpretation it appears that it was intended to give a real option, that is, that it was conceived possible that at the time fixed for performance, either alternative might prove the more desirable, the contract will be enforced according to its

terms. The fact that a promise is expressed in the alternative, however, may easily be given too much weight. As the question of liquidated damages or penalty is based on equitable principles, it cannot depend on the form of the transaction, but rather on its substance. It follows that a contract expressed in the alternative, when examined in the light of the existing facts may prove to be:

(1) a contract contemplating a single definite performance with a penalty stated as an alternative;

(2) a contract contemplating a single definite performance with a sum named as liquidated damages as an alternative; or

(3) a contract by which either alternative may prove the more advantageous and is as open to the promisor as the other.

*Id.* at 434 (quoting 5 Samuel Williston, *A Treatise on the Law of Contracts* § 781, at 706–07 (3d ed.1961)); *see* Restatement (Second) of Contracts § 356 cmt. c, at 159 ("Although the parties may in good faith contract for alternative performances ..., a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable....").

■ In *Superfos*, the court looked to a number of factors in reaching the conclusion that the contract in question was not a true alternative performance contract. First, the court explained that the "pay" option in a take-or-pay contract is neither a penalty nor a damage provision. Rather, the "pay" option is one of the buyer's performance alternatives. *Superfos*, 821 F.Supp. at 434. In a take-or-pay contract, the buyer can perform in either one of two ways: (1) take the minimum purchase obligation of the product or (2) pay the minimum bill. *Id.*

Second, the court recognized that take-or-pay contracts are common to the gas industry and are viewed as apportioning the risks of natural gas production and sales between the buyer and seller. *Id.* By assuring the buyer a supply of gas, the seller bears the risk of production. To compensate the seller for this risk, the buyer agrees to take, or pay

for if not taken, a minimum quantity of gas. *Id.* The buyer thus bears the risk of market demand, and if the demand for gas decreases, the seller is assured of receiving the price for the contract quantity delivered each year. *Id.*

Third, the court did not view the contract in question as a typical take-or-pay contract. The plaintiff's contention that it assumed the risks associated with production was not so because a *force majeure* provision in the contract relieved both parties of liability for failure to perform resulting from "events of *force majeure.*" *Id.* at 436.

Last, typical take-or-pay contracts allow a buyer to "make-up" for gas paid for but not taken. Thus, the take-or-pay contract allows the buyer a credit for gas paid for but not taken and permits the buyer to recoup the make-up gas over the term of the contract. *Id.* at 436–37. The make-up provision presents the buyer "a real choice between the two obligations [take or pay;] the second alternative, that of paying for gas not taken, is a prepayment resulting in a later credit, rather than a penalty." *Id.* at 437. The real choice provided by the make-up provision is "a determinative factor in the analysis of provisions of a contract to ascertain whether those contracts truly do provide 'alternative obligations.'" *Id.* Without the make-up provision, there is no "real option" because the buyer would be paying for nothing. *Id.* Because the contract gave the defendant no make-up right beyond the contract year, the court concluded the defendant had no real alternative under the contract. *Id.* at 439.

In *Superfos,* the court recognized that a contract with the payment of a liquidated sum of money as one of the alternative methods of performance can be a valid alternative performance contract. *Id.* The court, however, also recognized that

> where it cannot reasonably be concluded that at the time the contract was entered, paying for a product not taken might prove as desirable as taking the product and paying for it, then it cannot be reasonably concluded that the "pay" alternative is a true alternative.

*Id.* Thus, each of the alternative performances must present a "real choice." Or, put another way, the "pay" alternative must be just as advantageous as taking and paying for the product. In the court's opinion the pay option in the challenged contract was not a "real option." *Id.*

**C. The merits.** With the foregoing authorities in mind, we turn to the question of whether the Agreement here was a true alternative contract. Looking to the language of the Agreement, we note the provision relating to the commitment to supply the minimum tonnage of contaminated soil and the provision for liquidated damages are not set forth as alternatives. Additionally, the Board's obligation to provide the minimum tonnage of contaminated soil is not contained in the same article of the Agreement as the liquidated damages provision. This separation at least suggests the two obligations are not alternative performances. The language in this respect is akin to the language in *Public Service,* where in one clause the plaintiff agreed to transport a minimum amount of coal at a specified price during the contract year and in another clause agreed to pay liquidated damages for any shortfall during such year.

The Agreement uses the words "liquidated damages" in one of the so-called alternatives. This is telling on the question of the parties' intent. Such language ordinarily means the parties intended a remedy for damages in the event of nonperformance. This is reinforced in the last part of the provision, which describes the "liquidated damages" as "a reasonable estimate of [ASPI's] damages associated with the Board's inability to supply petroleum-contaminated soils." Parties include a liquidated damages provision in their contracts to provide a ready and relatively easy calculation of damages if there is a breach of contract. *See* Restatement (Second) of Contracts § 356 cmt. a, at 157 (stating purpose of liquidated damages provision is to provide a way to establish damages for nonperformance when those damages would otherwise be difficult to determine). One rule of contract construction relevant here is that we give words their commonly accepted meaning and interpret them in the context in which they are used. *Home Fed. Sav. & Loan*

*Assn. v. Campney,* 357 N.W.2d 613, 617 (Iowa 1984).

If the liquidated damages language in the Agreement means what it says, then there is no alternative to pay liquidated damages in the event of a shortfall of contaminated soil. This is because in a true alternative contract, the alternatives are not damages provisions but rather performance alternatives. *Superfos,* 821 F.Supp. at 434. Liquidated damages, on the other hand, are a remedy for a breach of a contract. *See* Restatement (Second) of Contracts §§ 346, 356, at 110, 157.

Turning to the substantive provisions of the Agreement, we can easily say it is not a take-or-pay contract. Like the contract in *Superfos,* the Agreement has a *force majeure* provision relieving the parties of risks if they are unable to perform because of events covered by *force majeure.* Risk allocation is a hallmark of take-or-pay contracts. *Superfos,* 821 F.Supp. at 435.

Most significant is the absence of a "make-up" provision in the Agreement. The Agreement has no provision that requires ASPI beyond the contract year to remediate contaminated soil for which the Board has paid liquidated damages. The Agreement unequivocally provides that payment of liquidated damages is due at the end of each Agreement fiscal year. Thus, the Board has no "real choice" to pay and later make up for the deficiency in tonnage within a make-up period.

There is still another reason the Board has no real choice under the Agreement: The alternative of paying $70.38 per ton of non-processed soil is not equally as advantageous to the Board as paying for soil that was remediated. *See* Corbin § 1082, at 464. In short, the Board has no "real choice" of alternatives. In effect, under the district court's construction of the Agreement, the Board is paying for nothing.

Moreover, we agree with the Board that the district court's construction of the Agreement renders the *force majeure* provision a nullity. Under the courts construction, the *force majeure* provision would never relieve the Board from paying liquidated damages even though events within the *force majeure* provision occurred. This is in violation of another rule of contract construction: "Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Fashion Fabrics,* 266 N.W.2d at 26 (citation omitted).

Finally, we reject ASPI's contention that unless we view the Agreement as an alternative contract, we will render the liquidated damages provision a nullity. In making this contention, ASPI assumes that whenever there is an "inability" to supply soil, the *force majeure* provision would always excuse performance.

ASPI reads too much into the *force majeure* provision. The provision only excuses failures to perform obligations under the Agreement "due to events, actions, or contingencies beyond [the parties'] reasonable control." Events within the Board's reasonable control that render the Board unable to perform are not excused and would require the Board to pay liquidated damages. One example would be the Board's arbitrary refusal to supply any available contaminated soil to ASPI. The *force majeure* provision would not excuse the Board from paying liquidated damages if ASPI sought those damages as a remedy.

We agree with the Board that the Agreement is not an alternative performance contract. We hold that as a matter of law the Agreement is a contract to provide a minimum of 20,000 tons of contaminated soil per Agreement year, with a liquidated damages provision in the event of the Board's unexcused nonperformance. The district court erred in concluding otherwise and in sustaining ASPI's motion for summary judgment and in overruling the Board's motion on this issue.

## V. The Force Majeure Provision.

ASPI attempts to uphold the district court ruling on the ground that the evidence as a matter of law does not support a finding that the Board is excused by the *force majeure* provision. The Board on the other hand argues the evidence supports a finding that the actions of the legislature and the IDNR were beyond the control of the Board

and for that reason the Board is excused as a matter of law by the *force majeure* provision. The district court did not reach the issue. It just assumed for the purposes of its ruling that the IDNR's actions prevented the Board from supplying ASPI with the required annual tonnage of contaminated soil required by the Agreement.

For reasons that follow, we think there are genuine issues of material fact on this issue, precluding summary judgment. We therefore reject the positions of both parties.

The Board's motion for summary judgment is supported by an affidavit of David L. Wornson, a staff attorney for the IDNR since 1991. His specific responsibility is to serve as legal counsel to the Underground Storage Tank Section of the IDNR.

In his affidavit, Wornson set out the following facts concerning the legislature's and the IDNR's changes to the underground storage tank regulatory scheme. In response to legislation passed in the spring of 1991, the IDNR adopted administrative rules applicable to corrective action at petroleum-contaminated underground storage tank sites. These rules took effect in February 1992. The 1991 legislation required the IDNR to establish a risk classification system that classified sites as high risk, low risk, and no action required. The legislation mandated that free product (pure gasoline) was to be "removed or contained on site," high risk sites were required to "comply with corrective action standards," and low risk sites were to be monitored. *See* Iowa Code § 455B.474(1)(f)(3), (4), and (5) (1995).

In applying its rules initially and at the time the Agreement was signed, the IDNR required high risk sites to actively remediate contaminants in soils and groundwater. By the fall of 1993, after the Agreement was signed, the IDNR adopted a policy of allowing high risk sites to be monitored for a period of time in lieu of active remediation. Additionally, under the policy, the IDNR would not approve excavation of contaminated soils until after completion of a comprehensive site assessment, approval of a risk classification, and approval of a corrective action response.

Because of the shift in policy that allowed monitoring of high risk sites, there was a corresponding reduction of conditions under which active remediation would be required. Consequently, sites that were formerly required to implement active remediation of contaminated soils were nearly eliminated. By 1995, the IDNR approved very few proposals for soil excavation as a corrective action.

In the spring of 1995, the legislature enacted legislation requiring the IDNR to adopt new corrective action rules. *See* 1995 Iowa Acts ch. 215, § 30. The legislation prohibited the IDNR from requiring responsible parties to undertake corrective action (including site assessment, monitoring and remediation) until the IDNR adopted new rules. The prohibition did not apply in cases where corrective action was necessary to "protect public health and safety or the environment." 1995 Iowa Acts, ch. 215, § 30.

Responding to this legislation, the IDNR adopted a policy that gave a responsible party the option of proceeding with site assessment or corrective action under preexisting rules or of simply waiting until the adoption of new rules. This policy effectively placed a moratorium on all corrective action, including soil excavations until August 1996, when the new rules were adopted. There were, however, a few sites that were required to take corrective action because these sites met the criteria of danger to public health, safety, and the environment.

Based on these facts, a factfinder could reasonably conclude that the legislature and the IDNR enacted changes to the underground storage tank regulatory scheme that put it beyond the reasonable control of the Board to provide the annual tonnage of contaminated soil required under the Agreement.

In reaching this conclusion, we are mindful that the IDNR—not the Board—has the statutory authority to decide when the remediation can begin on a site. *See* Iowa Code § 455G.20 ("Notwithstanding any other provision to the contrary, the department of natural resources shall have final approval for a determination as to when remediation shall begin on a site.").

On the other hand, the Board has not furnished figures detailing how many sites

were classified as high risk to be monitored as an alternative to remediation of soil in fiscal years 1995 and 1996. Nor has the Board furnished figures detailing how many sites were approved for or required to implement active remediation of soil in fiscal years 1995 and 1996. Thus, we cannot say as a matter of law that the *force majeure* provision relieved the Board of its obligation to supply *all* of the minimum tonnage called for by the Agreement.

## VI. Disposition.

Because the district court erred in sustaining the ASPI's motion for summary judgment and in overruling the Board's motion, we reverse and remand. On remand, the district court shall enter a ruling sustaining the Board's motion for summary judgment consistent with our determination that the Agreement is a contract with a liquidated damages provision. Because genuine issues of material fact exist on the Board's *force majeure* defense, the district court shall conduct further proceedings on that issue. We have considered all the contentions whether or not we have addressed them. Those we have not addressed we reject.

**REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

Although the Storage Tank Fund Board did not have the option of rendering either of two alternative performances, plaintiff did have the option of exacting a prescribed monetary compensation in the event of the board's inability to perform the agreement. This is made clear in the contract language providing:

> If in an Agreement year, the Board *is not able* to supply the twenty thousand ton minimum amount of petroleum contaminated soil as required by Article V(a) of this Agreement, the Board will pay [ASPI] liquidated damages of $70.38 for each ton the amount of Board-supplied soils fall short of the required twenty thousand ton minimum. This amount represents a reason-

able estimate of [ASPI's] damages associated with the Board's *inability to supply* petroleum contaminated soils.

(Emphasis added.) The italicized words in the quoted portion of the agreement make it clear that the liquidated damages were not to be paid for a willful breach but were to be insurance against a failure to perform for reasons beyond the board's control.

With respect to the *force majeure* provision, it is clearly repugnant to the plain meaning of the italicized language. This court has recognized that, when there are general and special provisions in a contract that are in conflict, the special provisions are to govern. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 863 (Iowa 1991); *Mopper v. Circle Key Life Ins. Co.,* 172 N.W.2d 118, 126 (Iowa 1969). In the present contract, the *force majeure* clause is a general boilerplate provision. The liquidated-damage clause is a special provision dealing with the inability of the board to perform the agreement. Consequently, the liquidated-damage clause should be given effect as written. I would affirm the judgment of the district court.